TRI–VALLEY PACKING ASSOCIA-
TION, a Corporation, Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 18125.

United States Court of Appeals
Ninth Circuit.

March 18, 1964.

Francis Kerner and Ricardo J. Hecht, San Francisco, Cal., for petitioner.

James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Harold D. Rhynedance, Jr., and Richard Whittington Whitlock, Attys., Federal Trade Commission, Washington, D. C., for respondent.

H. Thomas Austern, Gerry Levenberg and H. Edward Dunkelberger, Jr., Washington, D. C., for amicus curiae, National Canners Ass'n.

Before HAMLEY, JERTBERG and MERRILL, Circuit Judges.

HAMLEY, Circuit Judge:

This matter is before us on a petition to review a cease and desist order entered by the Federal Trade Commission in consolidated proceedings before that agency. The petitioner, who was the respondent in the Commission proceedings, is Tri-Valley Packing Association, a farmer-owned and operated, non-profit, cooperative corporation. The National Canners Association has filed an amicus curiae brief in this court dealing with one aspect of the case and supporting the position of Tri-Valley.

The Commission order under review requires Tri-Valley to cease and desist from discriminating in the price of food products sold in interstate commerce, in violation of section 2(a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526 (Act), 15 U.S.C. § 13(a) (1958). The order also requires Tri-Valley to cease and desist from giving promotional allowances to any customer, in violation of section 2(d) of the Act, 15 U.S.C. § 13 (d).

Tri-Valley is engaged in the business of selling and distributing canned fruits and vegetables, all of which it processes and cans at its plants in Modesto, San Jose and Stockton, California. The Association sells and distributes these products under the private labels or brands of its purchasers and also under its own labels or brands. In the course of this business products of like grade and quality are sold to a large number of customers located throughout the United States for use, consumption or resale. For the fiscal year ending January 31, 1959, the Association's sales amounted to $22,329,877.

Among Tri-Valley's customers are wholesalers, retailers, chain stores and associations. Certain of these customers, including some twelve to fifteen retail grocery chains, maintain buying agencies in San Francisco. In the course and conduct of its business, Tri-Valley has sold its products to these customers, in what is colloquially known as the "California Street" market, at lower prices than it has sold products of like grade and quality to customers who did not maintain their own buying agencies in San Francisco. Included in the latter group were retailers, and wholesalers who sell to the retail trade. The difference in prices charged customers who maintained buying agencies, and those who did not, ranges from five cents to fifty cents, or from two per cent to ten per cent, per case.

Tri-Valley's customers also purchased canned fruits and vegetables from other packers, sometimes under the same private label under which similar products were purchased from Tri-Valley, and sometimes under the labels or brands of the other packers. These products, whether purchased from Tri-Valley or another packer, were thereafter shipped by the customer either to its own retail outlets for resale to the public or, in the case of a wholesaler, to independent re-

tailers for resale to the public, and to hotels and restaurants.

In the course of its business, Tri-Valley also granted certain allowances to Central Grocers, Inc. of Boston, Massachusetts, and to Fred Meyer, Inc. of Portland, Oregon. Each of these allowances was granted pursuant to a specially tailored or negotiated arrangement. No arrangement on proportionally equal terms was offered or made available to other purchasers of Tri-Valley products serving, at least in part, the same areas served by Central Grocers and Meyer.

On August 6, 1958, the Commission issued a complaint against Tri-Valley in its Docket 7225, charging violations of section 2(a) of the Act. In its answer to this complaint Tri-Valley denied most of the essential allegations,[1] and interposed three separate defenses. The only one of these defenses which the Association thereafter relied upon was that the lower prices were made in good faith to meet an equally low price of a competitor as permitted under the proviso to section 2 (b) of the Act, 15 U.S.C. § 13(b).

On May 15, 1959, the Commission issued a complaint against Tri-Valley in its Docket 7496, charging violations of section 2(d) of the Act. In its answer to this complaint Tri-Valley denied, generally, most of the essential allegations of the complaint.[2]

The two proceedings were consolidated and protracted hearings were held before a hearing examiner. The hearing examiner filed an initial decision in which he concluded that the allegations of the complaints were sustained by the evidence, except as to injury to competition in the "primary line," i. e., injury at the seller level. The examiner issued a cease-and-desist order whereupon Tri-Valley

appealed to the Commission. The Commission, Commissioner Elman dissenting, set aside the initial decision and order and filed its own findings of fact, conclusions of laws and cease-and-desist order, accompanied by an opinion. This review followed.

We first consider the arguments relating to the price-discrimination feature of the order under review.

Tri-Valley argues that, with regard to the charge of price discrimination, the Commission adjudicated issues not raised in the complaint and at the hearings. In doing so, the Association asserts, the Commission failed to comply with the notice requirements of section 3.6 of the Commission's rules of practice for adjudicative proceedings, 16 C.F.R. § 3.6, section 5(a) of the Administrative Procedure Act, 60 Stat. 239, 5 U.S.C. § 1004 (a) (1958), and section 11 of the Clayton Act, as amended, 64 Stat. 1126, as amended, 15 U.S.C. § 21. Moreover, petitioner argues, such action deprived it of due process of law as guaranteed by the Fifth Amendment.

The asserted departures of the Commission findings of fact from the allegations of the complaint have to do with the identity of the purchasers affected by the price discrimination and the kind of competition adversely affected thereby.

One of the elements of the offense proscribed by section 2(a) is that a seller " * * * discriminate in price between different purchasers of commodities of like grade and quality * * * where such commodities are sold for use, consumption, or resale * * *." There is, as petitioner concedes, no requirement that there be favored and unfavored purchasers who compete with each other in the resale of the seller's product,[3] or, in-

---

1. Tri-Valley did admit that it is in competition with other corporations engaged in the same business, and that some of its purchasers are directly or indirectly in competition with each other in the resale of its products.

2. It did, however, make the same admissions as were made in its answer to the complaint in Docket 7225, referred to in note 1.

3. See Corn Products Refining Co. v. Federal Trade Comm'n, 324 U.S. 726, 731, 65 S.Ct. 961, 89 L.Ed. 1320.

deed, that they compete with each other at all.[4] But because it was alleged, in paragraphs four, five and the second subparagraph of paragraph six of the complaint, that the favored and unfavored purchasers competed with each other, directly or indirectly,[5] in the resale of Tri-Valley products, petitioner urges that the complaint so limited the class of purchasers alleged to have been affected by the price discrimination.[6]

The second element of the offense proscribed by section 2(a) is that:

"* * * the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *."

As indicated above, this competition need not be in the resale of the seller's products, nor need it be competition between favored and nonfavored purchasers from the accused seller. But because it was alleged in paragraphs four, five and the second subparagraph of paragraph six of the complaint, that the favored and nonfavored purchasers competed with each other, directly or indirectly, in the resale of *Tri-Valley* products, petitioners contend that the complaint so limited the kind of competition alleged to have been adversely affected by the asserted price discriminations.[7]

In the findings of fact incorporated in the initial decision of the examiner, it was found generally, and also with respect to seven specified sets of favored and disfavored purchasers, that such purchasers are competitively engaged in the resale of Tri-Valley products.[8] Thus, both as to the identity of purchasers and the kind of affected competition, the findings of the examiner did not go beyond what petitioner asserts are the limited allegations of the complaint.

But the Commission, upon its review of the initial decision, vacated the examiner's findings and entered new findings. In these new findings the class of affected purchasers and the kind of affected competition were not confined to, nor do they necessarily include, purchasers who directly or indirectly compete with each other in the resale of *Tri-Valley* products, or competition of that kind. In the new findings the class of affected purchasers was found to be that in which purchasers competed, directly or indirectly, in the resale of canned fruits and vegetables under each purchaser's private label.

Commission counsel apparently believes that the point petitioner is trying to make on this branch of the case is that whereas the complaint charged competition between favored and disfavored purchasers in the resale of Tri-Valley *products*, the findings refer to the competition as involving the resale of Tri-Valley's *private label* products. If this is the gist of petitioner's argument we agree with

---

4. See Federal Trade Comm'n v. Anheuser-Busch, Inc., 363 U.S. 536, 542, 80 S.Ct. 1267, 4 L.Ed.2d 1385.

5. In the context of this case, "indirect" competition between purchasers occurs when a retailer who obtains his goods from a disfavored wholesaler-purchaser is in competition with a favored retailer-purchaser.

6. Petitioner also contends that, because of the great multitude and variety of purchasers who may be involved in price discrimination practices, it was incumbent upon the Commission, under the notice provisions of the rule and statutes referred to above, to allege these facts limiting and restricting the classes of alleged purchasers to those actually involved in this case.

7. Petitioner also argues with regard to competition, as it does concerning purchasers, that the notice requirements referred to above necessitated these allegations delineating the lines of commerce and the competitive situations actually involved in the charge.

8. See examiner's findings of fact Nos. 9, 12, 15, 18, 21, 24, 27 and 29. At a later point in his initial decision the examiner discussed the sufficiency of the evidence to show competition of this kind, and concluded that the evidence was sufficient.

Commission counsel that it is without merit. The word "products" covers all of petitioner's products, including those packed under private label.

But, as we understand petitioner's contention, the asserted variance between complaint and findings is not premised on the distinction between "products" and "private label products." Instead, it is premised on the view that whereas the complaint limits purchasers and competition by referring to competition in the resale of *Tri-Valley* products, the Commission findings do not limit affected competition to that involving resale of Tri-Valley products, but include any competition in the resale of canned fruits and vegetables under each purchaser's private label.

Despite the allegations of paragraphs four and five, and of the second subparagraph of paragraph six of the complaint, upon which petitioner relies, we think it problematical whether petitioner was entitled to assume that the alleged price discriminations would be limited to purchasers who competed in the resale of *Tri-Valley* products, and to competition of that kind. It is true that the indicated paragraphs of the complaint are so limited in their allegations. But paragraph six of the complaint, in which six "illustrations of representative discriminations" are set out, contains five other subparagraphs in which no such limitations as to purchasers or competition are indicated. Each such subparagraph refers only to a named favored

purchaser and a named "competing" non-favored purchaser, and a reference to the sale of "similar" products.

In applying to the examiner for a bill of particulars, Tri-Valley did not take its present position concerning the scope of the complaint. It then argued that the complaint " *  *  * is not reasonably definite as to the *purchasers* and *commodities* involved. (Emphasis is in original.) In its points and authorities filed in support of that motion petitioner argued that: "[t]his very general allegation [of paragraph five] clearly includes all of respondent's purchasers and all of its customers." Referring to the six specific illustrations set out in paragraph six of the complaint, the Association argued, in this memorandum to the examiner:

> "There is nothing in the law or in logic which entitles either respondent [Tri-Valley] or its counsel reasonably to assume that counsel in support of the Complaint will not adduce evidence of *non-representative discriminations*, and for years other than 1957." (Emphasis is in original.)

Likewise, in its points and authorities in support of its motion made before the examiner to quash and limit the staff's subpoena duces tecum, Tri-Valley did not indicate that it construed the complaint as limiting the purchasers to those who compete in the sale of Tri-Valley products, or as similarly limiting the affected competition.[9] In our examination of the

9. In that memorandum, the petitioner said, in part:
> "The allegations of this paragraph [five] likewise confine the charge to competing buyers who buy *goods of like grade and quality.*
> *     *     *     *     *
> " *  *  * the very general charges of discrimination contained in the complaint [referring to paragraphs five and six] involve only *competing buyers, purchasing goods of like grade and quality.*" (Emphasis in original.)

In its brief to the Commission on that interlocutory appeal, petitioner said, in part:

> " *  *  * where the pleadings limit the issue to discriminations in price between different *competing* purchasers buying respondent's products of *like grade and quality* for *resale?*" (Emphasis in original.)
> *     *     *     *     *
> "It has been shown by reference to the Complaint and to the Answer that the issue herein is solely whether respondent has discriminated in price between *competing* buyers purchasing its *goods of like grade and quality for resale.*" (Emphasis in original.)

voluminous record of the hearings before the examiner we failed to note a single instance in which counsel for petitioner objected to questions relating to competition on the specific ground that they were not limited to competition between favored and disfavored purchasers in the sale of Tri-Valley products.

But, if it be assumed that the complaint so limited the identity of the affected purchasers and competition, we think no prejudice was shown. In this court Tri-Valley suggests some lines of cross examination it might have pursued, and some kinds of rebuttal evidence it might have produced, designed to deal with the assertedly enlarged class of affected purchasers and kind of affected competition dealt with in the Commission findings. However, it did not apply to this court for leave to adduce additional evidence, as it might have done under section 11(c) of the Clayton Act, as amended, 73 Stat. 243, 15 U.S.C. § 21 (c).[10]

No such application having been made, Tri-Valley is not in a position to argue that it is aggrieved by the lack of notice, in the respects described, as to the issues to be adjudicated. E. B. Muller & Co. v. Federal Trade Comm'n, 6 Cir., 142 F.2d 511, 519.[11]

We therefore conclude that the Commission order should not be set aside on the ground that the Commission adjudicated issues not raised in the complaint and at the hearings.[12]

A third argument advanced by the Association on the price-discrimination feature of the case is that the Commission findings to the effect that there was actual competition in the resale of private label canned goods are not supported by reliable, probative and substantial evidence. This is true, Tri-Valley argues " * * * because the evidence upon which they are based is of an inferior character or degree, and is therefore, *not reliable evidence*." (Emphasis is in original.)

The Commission found that there have been "numerous instances" of price discrimination by Tri-Valley in favor of certain large chain stores and against wholesalers and retailers in the sale of canned fruits and vegetables of like grade and quality. Five examples of such discriminations involving favored and nonfavored retailers are set out in the findings, it being stated that in each instance the chain store receiving the benefit of the discrimination was engaged in competition with one or more nonfavored purchasers in the sale at retail of food and grocery products "including canned fruits and vegetables sold under each purchaser's private label."

The last of these five examples, as stated in the findings, is as follows:

"In March 1957, respondent [Tri-Valley] sold products designated as Choice Heavy Syrup Sliced Y. C. Peaches to Safeway Stores in Denver, Colorado, at $5.30 per case, and to H. A. Marr in Denver, Colorado, at $5.55 per case."

Tri-Valley points out, as further indicated in another connection at a later point in this opinion, that Marr may have purchased a substantial portion of its private label line at the lower prices which Tri-Valley sold to Safeway in Denver. This is immaterial for present

10. Nor did petitioner, insofar as we can ascertain from the record, apply to the Commission to reopen the proceeding for that purpose when it learned, from the Commission's findings, that such purchasers and competition were not limited to those involving Tri-Valley Products.

11. See, also, Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 226, 59 S.Ct. 206, 83 L.Ed. 126; Coca-Cola Bottling Co. v. National La-

bor Relations Board, 8 Cir., 195 F.2d 955, 956.

12. What has just been said also calls for rejection of the argument that a prima facie case was not proved because there was a failure to show by substantial evidence that Tri-Valley's favored and nonfavored purchasers in fact competed with each other in the resale of Tri-Valley products of like grade and quality.

purposes, however, because Marr did pay Tri-Valley more than Safeway for canned peaches purchased in March, 1957, as the Commission found on unchallenged evidence.

Safeway is a retailer, and Marr is both a wholesaler and a retailer in the Denver, Colorado area. It is shown in the Commission's exhibit No. 44 that, in March, 1957, Tri-Valley sold peaches of like grade and quality to Safeway at $5.30 per case, and to Marr at $5.55 per case, a price differential of 4.5 per cent. The supply manager for Safeway testified that Safeway purchased only private label merchandise from Tri-Valley, these labels being Town House and Highway.

A witness who held a responsible position with Marr in 1957, testified that the Marr private labels in that year were Brimfull, Marco and Big M. A witness who had been a buyer for Marr in 1957 testified that fruit cocktail purchased by Marr from Tri-Valley in 1957, would "probably" carry Marr's Marco label, that apricots would "probably" carry Marr's Brimfull label, pears "possibly" the Brimfull label, and peaches "Brimfull." This witness testified that, in its retail operations Marr competed "with the established people in this market doing business, such as Safeway, Miller and King, and some independent merchants perhaps."

Tri-Valley argues that because the witness used the words "such as" in referring to Marr's retail competition with Safeway and others, because this witness did not explicitly state that there was such competition in 1957, and because "(n)o facts" were elicited to support the witness' conclusion respecting this competition, the Commission finding that such competition existed in 1957 is without substantial support in the record.

Reading the whole testimony of this witness we are convinced that he was talking about competition in 1957, and that, in using the words "such as," the witness did not mean to indicate doubt as to whether Safeway was one of the competitors. The Commission staff could have made a stronger showing as to competition by producing evidence as to the proximity of Marr and Safeway retail stores, and other evidence tending to support the witness' statement. We are unable to say, however, that because such additional evidence was not produced, the Commission was not entitled to accept the statement of the Marr buyer that such competition existed.

While the evidence was inadequate as to whether canned pears, purchased by Marr from Tri-Valley in 1957, carried the Marr private label, the testimony being "possibly," it was entirely adequate as to canned fruit cocktail and apricots, the testimony being "probably," and as to canned peaches, no qualification being expressed. As before indicated the 1957 price discrimination between Safeway and Marr was as to canned peaches.

In addition to the five examples set out in the Commission findings of fact, wherein favored and nonfavored purchasers were found to be in competition as retailers, the Commission also found that there had been what we have termed "indirect" competition between favored and nonfavored purchasers.[13] Specifically, the Commission found that certain chain stores receiving the benefit of Tri-Valley's price discriminations have also been engaged in competition in the sale of food and grocery products with independent retailers who were selling private label canned goods which they had purchased from unfavored wholesalers.

The Commission findings set out this example of competition of this kind:

"For example, respondent [Tri-Valley] discriminated in favor of Safeway Stores, a retail chain, and against H. A. Marr, a wholesaler, in the sale of goods of like grade and quality shipped to Denver, Colorado warehouses of these purchasers. The record shows that Foodland

13. See note 5.

Supermarkets and Preisser Grocery and Market, both of Denver, Colorado, and Piggly Wiggly No. 10, and CeBuzz, Inc., both of Littleton, Colorado, purchased canned goods from H. A. Marr and resold such products at retail in direct competition with retail outlets of Safeway Stores."

■ We have already adverted to the evidence showing that there were price discriminations favoring Safeway over Marr in the Denver, Colorado area in 1957. In our opinion, the evidence of record is sufficient to support the Commission finding that Foodland, Preisser, Piggly Wiggly No. 10 and CeBuzz were all in actual competition with Safeway in the Denver area in 1957, in the resale of private label canned goods of the kind which each obtained that year from Tri-Valley.

■ The findings as to actual direct and indirect competition between purchasers in the Denver area provides a sufficient factual basis, insofar as the existence of actual competition is concerned, for the cease-and-desist order relating to section 2(a), whether or not similar findings involving other purchasers and areas are supported by the record. It is therefore unnecessary to review herein the evidentiary support for these similar findings. We may say, however, that while the evidence concerning the existence of actual direct and indirect competition between purchasers is weak and perhaps insufficient with regard to some of these other purchasers and areas, we find it, for most purchasers and areas, sufficient to support the Commission findings.

The Association challenges, on several grounds, the Commission finding that the effect of Tri-Valley's price discrimination:

" * * * may be substantially to injure, destroy or prevent competition between chain stores receiving the benefit of such discriminations and nonfavored retailers and retailer customers of nonfavored wholesalers." [14]

■ This finding that the effect of the price competition "may be" substantially to injure competition, was essential to establish, under the circumstances of this case, a proscribed price discrimination within the meaning of section 2(a). The Commission, however, was not required to find that there had been actual injury to such competition, and it made no such finding. See Federal Trade Comm'n v. Morton Salt Co., 334 U.S. 37, 46, 68 S.Ct. 822, 92 L.Ed. 1196. We make this observation because part of Tri-Valley's argument on this point seems to be made on the erroneous assumption that the Commission made a finding of actual competitive injury, it being urged that the evidence does not support that finding. But there are other facets to appellant's argument, which we now discuss.

One respect in which the evidence of probable competitive injury is inadequate, Tri-Valley contends, is in the failure to show the cost to any purchaser, whether favored or nonfavored, of acquiring their lines or inventories of private label goods purchased from various canners, including petitioner. The most that can be said for the evidence in this regard, the Association asserts, is that it

14. As a basis for this finding, the Commission first found as follows:

"8. The Commission further finds that the grocery business is highly competitive, that markups at various levels of distribution are affected by competition, and that the percentage of return on large volume of sale is small. The net profit of some wholesalers does not exceed the customary two and one-half per cent cash discount accorded for prompt payment and the net profit of certain retailers runs less than six per cent. A price difference of only ten cents a case would in some instances be sufficient to cause a purchaser of canned fruit or vegetables to buy from one packer instead of another, and a difference of a cent or two a can could cause the loss of a sale at the retail level. Under these circumstances, a difference in the price of canned goods ranging from two per cent to ten per cent is sufficient to give the purchasers paying the lower price a substantial advantage over their competitors."

is open to inferences that its prices might or might not have had the effect of increasing or diminishing the cost of the inventories to the purchasers. This is insufficient, Tri-Valley urges, to cast upon it the burden of proving that the undisclosed facts pertaining to prices paid other suppliers and other costs of acquiring the inventories are such as to forbid the inference that Tri-Valley's differentials did increase the costs thereof to the nonfavored buyers or their customers.

We are unable to appreciate the problem which Tri-Valley poses. There was evidence that certain nonfavored purchasers paid Tri-Valley more for private. label canned goods than was paid Tri-Valley by certain competing favored purchasers. This seems to us direct evidence that it cost the nonfavored purchasers more to acquire their lines or inventories of private label goods purchased from various canners, including Tri-Valley, than in the case of favored purchasers purchasing from various canners, including Tri-Valley. Without regard to the proportionate amount of canned goods nonfavored purchasers obtained from Tri-Valley as compared to other canners, the dollar amount of the price discrimination must have been reflected in the cost of acquiring the inventory.

The Association further argues that the Commission staff did not adduce any evidence that Tri-Valley's prices had any influence on the resale prices of any products. It urges that a price difference does not *per se* have the proscribed effect on competition. To be illegal, Tri-Valley asserts, a price difference must be substantial, and to be substantial, it must have a measurable effect on the competitive relationship.

We need not decide whether, in order to show that a price difference is substantial it must be established that it has some measurable impact on resale prices. For here there is adequate evidence that the price discriminations had such an impact. There was testimony that those

engaged in the resale of such products operate on a very narrow margin—so narrow, in fact, that it is essential to take advantage of two per cent discounts for cash. The price discriminations, on the other hand, ranged from two per cent to ten per cent.

This would indicate that non-favored retailers, and retailers who purchased from nonfavored wholesalers, were required to maintain retail prices at least two per cent higher than those of favored retailers in order to realize any appreciable profit on retail sales. In view of the highly competitive nature of the business, price disparities of this kind could well endanger the ability of these merchants to compete with favored retailers, or so the Commission could find.

Finally, on the question of competitive injury, Tri-Valley argues that there is lacking any causal connection between the price discrimination and any competitive injury nonfavored purchasers may suffer by reason of such price discrimination. This is true, petitioner contends, because the evidence affirmatively shows that the nonfavored buyers could have availed themselves of the lower prices for which Tri-Valley and its competitors sold these goods in San Francisco.

The probability of competitive detriment on the buyer level presupposes a causal link between the seller's prices and the impact on customer competition. See Rowe, Price Discrimination under the Robinson-Patman Act, (1962), §§ 6.8, 8.5, pp. 139, 186. As Rowe indicates, the lack of a causal nexus between challenged price and asserted detriment to competition may be established in a number of ways, one being that the goods were and are available at the lower price from another source.[15] To be more specific, if the lower price would have been available to the nonfavored buyer in the same market where the favored buyer made his purchase, the probability of competitive injury due to the fact that the nonfavored buyer paid more for the product

15. Rowe, supra, § 8.5, pp. 186, 193–195.

is not the result of price discrimination, but of the nonfavored buyer's failure to take advantage of the opportunity, equally available to him, of buying at the same low prices.[16]

Tri-Valley asserted before the Commission, and reasserts here, that there is nothing in the record to indicate that there was or is any obstacle which prevented or prevents nonfavored purchasers from buying Tri-Valley products in the so-called "California Street" market in San Francisco, where they would have obtained the same low prices that were offered to favored purchasers in that market. Tri-Valley also calls attention to testimony tending to show that H. A. Marr, a wholesaler and retailer in the Denver area, whose business has been discussed earlier in this opinion, purchased a good portion of its Tri-Valley products through a San Francisco broker who operated in the California Street market where Tri-Valley offered its low prices.

While Tri-Valley presented before the Commission the factual basis upon which this argument is made, it did no more than suggest the legal question which it now urges concerning the necessity of a causal connection between price differentials and probable competitive injury. This may explain why the Commission did not deal with the problem in its opinion or findings. Nor have Commission counsel dealt with the contention in their brief in this court.

■ Disposition of this question is dependent upon the facts pertaining to the availability, to nonfavored purchasers, of the low prices for Tri-Valley products on the California Street market, and the application of the law to those facts. It is not our function to find these facts, and the Commission should first speak as to the application of the law to the facts which are found. We have therefore concluded that the proceedings should be remanded to the Commission for that purpose unless we can and do determine, on this review, that Tri-Valley established a defense which exculpates it even if there have been section 2(a) price discriminations.

We refer to the "meeting of competition" defense asserted in petitioner's third affirmative defense. It is with regard to this issue alone that the National Canners Association has filed an amicus curiae brief in support of petitioner's position. This defense is based on the proviso appended to section 2(b) of the Act, 15 U.S.C. § 13(b).

■ Under this "meeting of competition" proviso a seller who has discriminated in prices between different purchasers of commodities of like grade and quality, sold for use, consumption or resale, the effect of which may be to lessen or tend to injure competition, contrary to section 2(a) of the Act, may nevertheless exculpate himself by showing that he acted in self-defense. The burden of establishing the section 2(b) defense is upon the seller. Federal Trade Comm'n v. Sun Oil Co., 371 U.S. 505, 514, 83 S.Ct. 358, 9 L.Ed.2d 466.

Tri-Valley claimed in the agency proceedings that its lower prices to certain purchasers were made in good faith to meet the prices of competing packers in the California Street market. The Commission found and concluded, however, that the showing made by petitioner concerning the necessity of meeting competition in California Street, was in-

---

16. As stated in the Report of the Attorney General's Committee to Study Antitrust Laws (1950), pp. 164–165:

"Nor should a competitive price reduction be singled out as responsible for 'injury' if alternative means of access to goods at the lower price are in any event available to the buyer."

A reverse application of this principle, not pertinent in our case, is where the lower price received by a favored buyer from an accused seller would in any event have been available to the favored buyer from another source. See Rowe, supra, § 8.5, pp. 186, 193–195. This application of the principle under discussion is not pertinent here because Tri-Valley is the only source of the products in question.

sufficient to establish a valid defense under section 2(b).

The canners and processors who participate in the California Street market sell most of their products in that market. As of 1957, the prices paid for goods in this market tended to be lower than the prices paid for the same or similar goods by purchasers who were not represented in it.

At the beginning of the pack year, the canners and processors who sell on the California Street market determine from their records the amount of goods sold to various buyers in previous years. The sellers then attempt to obtain "reservations" from the buyers for a given amount of merchandise to be delivered during the buying season, preferably in excess of that previously purchased.[17]

After the reservations have been entered into, the canners announce their "opening prices." These opening prices are usually announced by the large or important factors in the industry comprised of the three or four nationally-advertised brand packers, or independent packers, of a particular commodity. When these price leaders have named their opening prices, the other canners, after examining their costs, will usually follow and name prices which are substantially similar to those of the leaders.

After the opening prices have been announced, they are analyzed by the buyers, who then set the market price at the level of the lowest prices offered by reliable canners, and proceed to place their orders. A canner whose prices are in line with the established prices will receive a fair share of shipping instructions. If he does not, or if he receives instructions only for limited quantities, the canner checks with the brokers, buyers or with other canners to determine the reason.

In holding that Tri-Valley had failed to establish a valid defense under section 2(b), the Commission referred briefly in its findings to the operation of the California Street market and then found and concluded as follows:

"Although the opening prices in the 'California Street' market are ordinarily announced by the packers, the goods are not sold in appreciable volume unless the prices are satisfactory to the buyers.

"Respondent has admitted that almost invariably the 'market price' in this market is established below the range of opening prices. Although respondent was aware of all these facts and therefore knew, or should have known, that the lower prices of its competitors were discriminatory, it did not adduce evidence to show that it had reason to believe that such prices could have been cost justified or otherwise excused under Section 2(a). Since respondent has failed to prove that it had reason to believe that the prices of its competitors were lawful, it has not established on the record that it acted in good faith in meeting such prices."

The Commission thus held, in effect, that where a seller knows, or should have known, that the lower prices of its competitors were discriminatory, the meeting of such competition is not in "good faith" within the meaning of section 2(b) unless such seller had reason to believe that the competitor's prices could have been cost justified or otherwise excused under section 2(a).[18] Applying that

---

17. A "reservation" is a booking which the prospective buyer places with the seller. It is not a contract, but is in the nature of a memorandum which usually does not state the price of the goods. Under it, the seller is not obliged to deliver, and the buyer is not obliged to accept, unless there is a meeting of minds on the price.

18. Price differentials are excusable under section 2(a), if they make only due allowance for differences in the cost of manufacture, sale or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered, or if made in response to changing conditions affecting the market or the marketability of the goods concerned.

proposition in this case, the Commission, as indicated by the above-quoted finding and conclusion, determined that Tri-Valley knew, or should have known, that the lower prices of its competitors were discriminatory, and yet it failed to adduce evidence to show that it had reason to believe that such prices could have been cost justified or otherwise excused under section 2(a).

In its accompanying opinion, the Commission seems to have expressed a broader view concerning petitioner's burden of proof, one which would seemingly apply whether or not the petitioner knew, or should have known, that the competing prices were discriminatory. That view is that, as a part of the good faith requirement of this defense, petitioner had the burden of showing the existence of circumstances which would lead a reasonable person to believe that the lower prices it was meeting were lawful prices.

In their brief on this appeal the Commission counsel defend the Commission view as stated in the quoted findings, and apparently also the broader view expressed in the Commission's opinion. But Commission counsel also suggest another basis for the determination that the "meeting of competition" defense had not been established. This basis, which may be preferred by Commission counsel since it is presented first, is that a lowered price is within the proviso of section 2(b) only if it is made in response to an individual competitive demand, and not as part of the seller's pricing system, such as that represented by the California Street market.

█ This would appear to be a threshold question which ought to be resolved before questions concerning the duty of a seller to adduce evidence as to the lawfulness of competitive prices, or as to the seller's knowledge of such lawfulness, are reached. If, as Commission counsel now contend, Tri-Valley was not engaged, in the California Street market, in meeting "an equally low price of a competitor," within the meaning of proviso to section 2(b), that is the end

of the matter, insofar as that defense is concerned. What Tri-Valley's duty would be concerning the production of evidence bearing upon the lawfulness of competitive prices then becomes immaterial, for there would be no competitive prices within the contemplation of the proviso.

The Commission should accordingly deal first with this question on the facts and law and, indeed, until it has done so it will not be known whether this court will have to deal with that question or any other question concerning the "meeting competition" defense.

A remand of the cause is therefore necessary for further proceedings bearing upon the unresolved price discrimination question to which we have previously referred, and upon the question of whether the competition which Tri-Valley faced in the California Street market is the kind of competition contemplated by the "meeting of competition" defense of section 2(b).

We now consider the arguments relating to the charge that, in granting certain allowances to Central Grocers, Inc., of Boston, Massachusetts, and Fred Meyer, Inc., of Portland, Oregon, Tri-Valley violated section 2(d) of the Act, forbidding unequal treatment of customers with regard to promotional allowances.

In the Boston area Tri-Valley sold its products in 1957 and 1958 to four customers.

One of these is Central Grocers, a quasi-cooperative owned by approximately one hundred retailers in that area. With regard to these retailer-members, Central Grocers operates as a wholesaler, buying goods from Tri-Valley and other sources, warehousing them in Boston, and reselling them to its retailer-members. Central Grocers also acts as a wholesaler in distributing food products to twenty-five independent retailers, the latter distribution representing about fifteen per cent of Central Grocers' volume. The company bought canned fruits and vegetables from Tri-Valley under Central Grocers' private label.

Another customer of Tri-Valley in the Boston area is First National Stores. This is a retail chain owning and operating approximately 135 to 140 retail stores in the Boston trade area. These are among the 197 First National retail stores which are serviced from the company's Boston warehouse.

Tri-Valley's third customer in that area is Great Atlantic & Pacific Tea Company. A. & P. is a retail chain and, in the Boston area, maintains 163 stores, all serviced from its Boston warehouse. Some eighty-one of these stores are in the Boston metropolitan area.

Tri-Valley's fourth customer in that area is Standard Grocery Company, a wholesaler with one warehouse located in Boston. Standard supplies some seven hundred small or medium size independent grocers in the Boston area.

One of the selling methods employed by the first of these Tri-Valley customers, Central Grocers, involves the use of a buying or order guide which is distributed to its retail stores about once a month.[19] In 1957 and 1958, Tri-Valley had an arrangement with Central Grocers by which it ostensibly paid $37.50 a quarter, or a total of $150 per year for an advertising mat in the guide which featured Central Grocers' private label canned fruits. The substance of the arrangement, however, was that Tri-Valley would pay to Central Grocers ten cents per case or $150 for the first 1,500 cases of canned fruits purchased by it, and an additional ten cents per case for each case of goods thereafter purchased during the year. These payments were made in consideration of supplying Central Grocers' private label canned fruits, and in "return for that business and to move that volume of merchandise."

Tri-Valley did not offer or make available these arrangements on proportionately equal terms to any of its other three customers in the Boston area.

In the Portland, Oregon area, Tri-Valley sold its products to two customers.

One of these is Fred Meyer, Inc., which operates twelve retail stores which cover the entire Portland area, including several stores within the city limits. Tri-Valley's other customer in that area is Hudson House, Inc. This company is a wholesaler, supplying about 286 retail stores, of which ninety-seven are in the Portland area, many of these within the city limits. Hudson House also owns several Piggly Wiggly retail stores in Portland. The company also services non-retailer customers such as restaurants and hotels.

In September and October, 1957, Meyer instituted a "coupon book" program. These books were pocket-sized pamphlets containing detachable coupons illustrating various products offered by Meyer to the purchasing public. Tri-Valley contracted with Meyer to participate in this coupon book program. In this contract, Tri-Valley agreed to pay $350, as and for the cost of printing the private label peach coupons, and to redeem each coupon at the rate of $0.248.

By the terms of these coupons Meyer offered to sell three cans of its private label peaches for the price of two. Petitioner complied with the terms of this contract and, in 1957, redeemed 20,750 coupons turned in by Meyer.

Tri-Valley also paid Hudson House a promotional allowance of one hundred dollars, but this payment did not have a proportional relationship to the payment made to Meyer.

There are three essential elements which must be established in order to prove a violation of section 2(d). We designate them as (a), (b) and (c) in this paraphrase of the statute: Where (a) two or more customers of a particular seller compete with each other in the distribution of the products of that seller, (b) the latter shall not pay or contract for the payment of anything of value to or for the benefit of such a customer as compensation or in consideration for any services or facilities furnished by or

19. It is probable that this method is utilized with regard to all accounts, "affiliate" as well as retailer-members, but this is not entirely clear in the record.

through such customer in connection with the sale, or offering for sale of any products sold or offered for sale by the seller, (c) unless the allowance is available on proportionally equal terms to the competing customers.

The Commission found, with respect to both the Central Grocers and Meyer allowances, that the facts establish all three of the essential elements referred to above.

Tri-Valley challenges the Commission findings with regard to the first two of these elements.

With regard to the second of these factors Tri-Valley maintains that the payments made to Central Grocers and Meyer were not in consideration of any services rendered or to be rendered by those two customers in the sale or offering for sale of any goods sold by Tri-Valley. Rather, petitioner contends, the payments were made to induce or facilitate the original sale of the goods without exacting benefits, services or facilities from these customers.[20]

■ Our review of the evidence convinces us that the Commission was warranted in finding that the allowances given Central Grocers and Meyer were in compensation for the promotion, over a period of time, of Tri-Valley's line of products, and were not given exclusively, if at all, to facilitate the original sale by Tri-Valley to those two customers.

Questioning the Commission findings with regard to the first of the three section 2(d) elements referred to above, Tri-Valley contends that there is no substantial evidence to support the finding that customers of Tri-Valley who did not receive allowances proportional to those given Central Grocers and Meyer, in fact competed in the distribution of Tri-Val-

ley products with customers of Tri-Valley who did receive allowances. Actual competition was not proved, petitioner contends, because Tri-Valley products were not traced to the shelves of any two Tri-Valley customers who were in such geographical proximity as to indicate that they were in competition with each other, one of whom had received the allowance, and the other of whom had not.

■ In our opinion, where a direct customer of a seller, operating solely on a particular functional level such as wholesaling or retailing, receives a promotional allowance not made available to another direct customer operating solely on the same functional level, it is unnecessary to trace the seller's goods of like grade and quality to the shelves of competing outlets of the two in order to establish competition. It is sufficient in that case to prove that one has outlets in such geographical proximity to those of the other as to establish that the two customers are in general competition, and that the two customers purchased goods of the same grade and quality from the seller within approximately the same period of time. Actual competition in the sale of the seller's goods may then be inferred even though one or both of the customers have other outlets which are not in geographical proximity to outlets of the other customer.

■ The view just expressed is in keeping with the underlying purpose of section 2(d). That purpose is to require sellers to deal fairly with their customers who are in competition with each other, by refraining from making allowances to one such customer unless making it available on proportionally equal terms to the others. In its practical operation this objective cannot be achieved unless sellers who propose to make such an allow-

---

20. It has been held that the mere acceptance by a customer of an allowance intended to facilitate the original sale does not constitute the rendering of a service or facility by the customer within the meaning of section 2(d), although it may

be a price discrimination under section 2(a). See New England Confectionery Co., 46 F.T.C. 1041, 1059 (1949); Rowe, Price Discrimination under the Robinson-Patman Act (1962), pp. 107, 379.

ance assume that all of their direct customers who are in functional competition in the same geographical area, and who buy the seller's products of like grade and quality within approximately the same period of time, are in actual competition with each other in the distribution of these products. If this is the assumption upon which sellers must act to avoid a section 2(d) violation, it is the assumption upon which courts may proceed in determining whether there has been a violation.

In the case before us, however, no set of circumstances has been called to our attention which meets the criteria suggested above. Central Grocers, one of those charged with receiving an allowance not made available to competitors, is a wholesaler doing business in the same geographical area as another wholesaler, Standard Grocery Company, which did not receive an allowance. Thus, there was functional competition between them. But our attention has not been called to any evidence in this record indicating that, during approximately the same period of time, Tri-Valley sold canned goods to both Central Grocers and Standard Grocery.

The only pertinent exhibit which has been called to our attention (Comm. Ex. 45), shows one sale to Standard Grocery in April, 1957, but none to Central Grocers any time that year. Presumably there were some sales to Central Grocers in that year since the allowance in question was extended in 1957 as well as in 1958. But whether any such 1957 sale to Central Grocers was in April, or sufficiently close to April, so that this wholesaler and Standard Grocery could be said to be in competition, is not established by any part of the record called to our attention.

If there is presently evidence in the record which would show such proximity as to time of purchases by Central Grocers and Standard Grocery, or if evidence is later adduced showing this, then as to these two customers of Tri-Valley actual competition would be established and, as to them a section 2(d) violation would be established. If this is the only section 2(d) violation established, however, flagrant or extensive violations of that statute would not be shown and the cease-and-desist order should accordingly be of limited scope. See Swanee Paper Corp. v. Federal Trade Comm'n, 2 Cir., 291 F.2d 833, 838.

The other direct customers of Tri-Valley in the Boston area, none of whom received a proportional allowance, are retailers and as such, are not entitled to treatment comparable to that accorded Central Grocers, because not in functional competition with that wholesaler. See Atalanta Trading Corp., 53 F.T.C. 565, 566, 573 rev'd on other grounds, Atlanta Trading Corp. v. Federal Trade Comm'n, 2 Cir., 258 F.2d 365. As to them the only way of showing a section 2(d) violation would be to treat Central Grocers' retail outlets as "indirect" customers of Tri-Valley. This, however, may not be done in the absence of a showing that Tri-Valley engaged in a course of direct dealing with those retail outlets.[21] No such showing was made here.

In the Portland area, Meyer, which received an allowance, is a retailer, and Hudson House, which did not receive a proportionally equal allowance, is principally a wholesaler, but may also be a

---

21. See Klein v. Lionel Corp., 3 Cir., 237 F.2d 13; Rowe, supra, § 13.11, pp. 398–399; contra Krug v. International Tel. & Tel. Corp., D.N.J., 142 F.Supp. 230. Examples of direct dealing sufficient to give application to the "indirect" customer concept, are to be found in American News Co. v. Federal Trade Comm'n, 2 Cir., 300 F.2d 104; Elizabeth Arden, Inc. v. Federal Trade Comm'n, 2 Cir., 156 F.2d 132; K. S. Corp. v. Chemstrand Corp., S.D.N.Y., 198 F.Supp. 310; Champion Spark Plug Co., 50 F.T.C. 30, 44.

retailer.[22] No section 2(d) violation was shown as to the wholesale operation of Hudson House, because that operation was not in functional competition with Meyer, and it was not shown that the independent retailers served by Hudson House were "indirect" customers of Tri-Valley.[23] No section 2(d) violation was shown as to the retail operation of Hudson House, if there was such an operation, because it was not shown that any Tri-Valley goods were purchased indirectly by those Piggly-Wiggly outlets, during the period in question. This could only have been shown by tracing Tri-Valley goods to the shelves of those stores by means of the best evidence available.

For the reasons stated above we hold that the Commission findings and conclusions to the effect that Tri-Valley violated section 2(d) must be set aside. As we have remanded this cause for further proceedings with regard to other matters we think it appropriate to afford the Commission, on such remand, the opportunity of calling attention to evidence presently in the record, or of producing additional evidence, which will overcome the present seeming, or actual, lack of factual support for the section 2(d) charges as discussed above.

Any judicial review following the entry of Commission orders resulting from proceedings on remand may be upon the present record and briefs as appropriately supplemented.

Tri-Valley's final argument on this review pertains to the form of the cease-and-desist order which has been entered, it being asserted that, in its breadth and scope, the order exceeds the legitimate needs of the case.

Since the Commission order is being set aside as to both the section 2(a) and section 2(d) issues, it is unnecessary to deal with this argument.

The order is reversed and the cause is remanded for further proceedings as directed herein.

22. If Hudson House does any retailing, it is because of its ownership of several Piggly Wiggly stores in the Portland area. Each of these is apparently a separate

corporate entity and Tri-Valley contends that they are dealt with by Hudson House just as if they were independent retailers.

23. See this opinion opposite note 21.