R. H. MACY & CO., Inc., Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 3, Docket 27687.

United States Court of Appeals Second Circuit.

Argued Sept. 30, 1963.

Decided Jan. 16, 1964.

446

William Simon, Washington, D. C. (John S. Voorhees and A. Duncan Whitaker, Washington, D. C., Marvin Fenster, New York City, and Howrey, Simon, Baker & Murchison, Washington, D. C., on the brief), for petitioner.

E. K. Elkins, Atty. Federal Trade Commission, Washington, D. C. (James McI. Henderson, Gen. Counsel and J. B. Truly, Asst. Gen. Counsel, Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

SMITH, Circuit Judge:

This is a petition by R. H. Macy & Co., Inc. asking us to review and set aside an order of the Federal Trade Commission directing that Macy's cease and desist from engaging in a business practice which the Commission deemed violative of Section 5 of the Federal Trade Commission Act, 38 Stat. 719 (1914), 15 U.S. C. § 45.[1] The proceeding arose from Macy's solicitation of approximately 750 of its some 20,000 vendors to contribute $1000 apiece to help defray the advertising and promotional costs of its 100th Anniversary Celebration, which took place in 1958. About 582 vendors agreed to contribute, and by March 21, 1960, Macy's had received approximately $540,-000 from its vendors. The advertising and promotions which Macy's created with the funds it solicited were institutional in character, designed to enhance Macy's reputation in the community; vendors were not offered any particular display or advertising which promoted their products in exchange for their contributions. Vendors were selected for solicitation on the basis of past performance and potential for growth in sales to Macy's, and $1000 was asked from each.

The solicitations were made by Macy's buyers, reinforced when thought desirable by their supervisors. In an initial decision, the Hearing Examiner found that there was neither evidence of "a reasonable likelihood of substantial lessening of competition between vendors or between Macy's and its competitors," nor evidence of favoring contributors or discriminating against non-contributors. He dismissed the complaint on the ground that this was not the kind of unfair trade practice that Section 5 of the Federal Trade Commission Act condemned. Although accepting the findings of fact of the Hearing Examiner, the Commission reversed his decision on the theory that the solicitation of contributions from vendors by the buyers of a store as large as Macy's is inherently oppressive and coercive, and that it contravenes the spirit of the Robinson-Patman Act, therefore violating Section 5 of the Federal Trade Commission Act.

A strong attack is made on the Commission's finding that the solicitation of $1000 from vendors in Macy's manner was inherently oppressive and coercive. The Commission concedes that the

1. 15 U.S.C. § 45 provides:
"(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.
* * * * * * *

"(6) The Commission is empowered and directed to prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

"record does not show overt pressure upon vendors to give, such as threats of discontinuance of purchases or offers of more business." It predicates its finding of oppression on a set of assumptions about the psychological state of vendors when confronted with a request to contribute to Macy's. As the Commission stated, "The vendor could not know what the result might be if he refused, and this in itself was great pressure on him to give." Yet, so far as appears, none of those solicited were "captive suppliers"; none of the vendors called as witnesses sold more than 6.99% of their total sales to Macy's, and many sold less than 1%. Although the Commission's finding that "vendors, as a practical matter, could not well afford to refuse Macy's request" derives some support from the testimony of one vendor and from the testimony of some of Macy's executives, and might seem reasonable as a matter of common sense, it is undisputed that 168 vendors out of the 750 solicited did refuse, and suffered no consequences.

█ We consider it unnecessary to determine whether Macy's conduct was oppressive and coercive. Nor do we find it necessary to determine whether Section 5 of the Federal Trade Commission Act authorizes the Commission to prohibit any trade practice which it deems to contravene the spirit of the Robinson-Patman Act, for Macy's induced its vendors to make payments forbidden by Section 2(d) of the Clayton Act as amended by the Robinson-Patman Act, 49 Stat. 1527 (1936), 15 U.S.C. § 13(d).[2] And where activity "runs counter to the public policy *declared* in the Sherman and Clayton Acts, the Federal Trade Commission has the power to suppress it

as an unfair method of competition." Fashion Originators' Guild of America v. F. T. C., 312 U.S. 457, 463, 61 S.Ct. 703, 706, 85 L.Ed. 949 (1941) (emphasis added).

In Grand Union v. F. T. C., 300 F.2d 92 (2 Cir. 1962) and American News Co. v. F. T. C., 300 F.2d 104 (2 Cir. 1962), cert. denied 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962), this court sanctioned a determination by the Federal Trade Commission that a buyer's inducement of a seller to violate Section 2(d) of the Robinson-Patman Act was an unfair method of competition interdicted by Section 5. It was necessary for the Commission to resort to Section 5 because of the peculiar drafting of Section 2(d). Though the announced purpose of Section 2(d) was to prevent large buyers from using their economic leverage to secure special promotional and advertising allowances, the language actually employed in Section 2(d) paradoxically makes no mention of a restraint on buyers. Instead, it prohibits vendors from making disproportionate payments to customers in connection with advertising or promotional programs. In Grand Union and American News, supra, this court held that a buyer who knowingly induced a seller to violate Section 2(d) of the Robinson-Patman Act through solicitation of special promotional and advertising payments had committed a *per se* violation of Section 5 of the Federal Trade Commission Act.[3] Speaking for this court in Grand Union, Judge Clark observed that "there seems to be no specific reason why Congress omitted buyers from the coverage of § 2(d), while including them under § 2(c) and (f); the omission was more 'inadvertent' than 'studious.' Cer-

2. 15 U.S.C. § 13(d) provides:
"It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities

manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

3. Accord: Giant Food, Inc. v. F. T. C., 113 U.S.App.D.C. 227, 307 F.2d 184 (1962), cert. denied 372 U.S. 910, 83 S.Ct. 723, 9 L.Ed.2d 718 (1963).

tainly buyers were not left out because Congress favored them or wished to permit them to engage in activity proscribed to sellers." 300 F.2d at 96.

Macy's seeks to distinguish these cases on the ground that they expressly predicated a violation of Section 5 of the Federal Trade Commission Act on a finding that the seller had violated Section 2(d) of the Robinson-Patman Act in making the induced special payments to the buyer. In the instant case, Macy's contends there has been no violation of Section 2(d), for by its terms, Section 2(d) applies only to payments which are made "as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person." Macy's position is that it has rendered no services or facilities directly related to the sale of goods of any particular vendor; therefore, there has been no violation of Section 2(d). Support for this narrow interpretation is derived from the Commission's own decision in Yakima Fruit & Cold Storage Co., F. T. C. Dkt. No. 7718 (1960), which vacated an initial decision on the ground that a "donation" made in response to a solicitation to participate in a customer's anniversary sale was not a payment in consideration of services and facilities furnished by the customer.[4]

We think this too narrow a reading of Section 2(d). In enacting the Robinson-Patman Act in 1936 "to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power," F. T. C. v. Henry Broch & Co., 363 U.S. 166, 168, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124 (1960), Congress could perhaps have worded the legislation more clearly. But one of the evils

that Congress made clear that it was condemning under Section 2(d) was an advertising or promotional allowance exacted by a large buyer to achieve indirect price discriminations, either through shifting the buyer's advertising costs to his vendors, or through simply pocketing the difference between an inflated allowance and that amount actually spent to advertise or promote the vendor's product. Both the reports of the House and Senate Judiciary Committees contain the following explanation of the practices Section 2(d) was aimed at:

> Still another favored medium for the granting of oppressive discriminations is found in the practice of large buyer customers to demand, and of their sellers to grant, special allowances in purported payment of advertising and other sales-promotional services, which the customer agrees to render with reference to the seller's products or sometimes with reference to his business generally. Such an allowance becomes unjust when the service is not rendered as agreed and paid for, or when, if rendered, the payment is grossly in excess of its value, *or when in any case the customer is deriving from it equal benefit to his own business and is thus enabled to shift to his vendor substantial portions of his own advertising cost, while his smaller competitor, unable to command such allowances, cannot do so.* (Emphasis added.) H.R. Rep. 2287, 74th Cong., 2d Sess. 15–16 (1936); S.Rep.No.1502, 74th Cong., 2d Sess. 7 (1936).

Senator Logan, the manager of the Robinson bill in the Senate, explained that it prohibited a buyer from using an advertising allowance to promote products other than those of the seller from whom

---

**4.** The proceeding was reopened by the Commission on motion of counsel in support of the complaint. After taking additional evidence, the examiner issued a second "initial decision" in which he found that the payments were actually made for advertising services in connection with the sale of the supplier's products. This decision and finding were adopted by the Commission on September 28, 1961.

the allowance was secured.[5] Representative Utterback, Chairman of the Senate-House Conferees, explained the purpose of Section 2(d) in these terms:

> The existing evil at which this part of the bill [2(d)] is aimed is, of course, the grant of discriminations under the guise of payments for advertising and promotional services, which, whether or not the services are actually rendered as agreed, results in an advantage to the customer so favored as compared with others who have to bear the cost of such services themselves. The prohibitions of the bill, however, are made intentionally broader than this one sphere in order to prevent evasion in resort to others by which the same purpose might be accomplished, and it prohibits payment for such services or facilities whether furnished "in connection with the processing, handling, sale, or offering for sale" of the products concerned. 80 Cong.Rec. 9418 (1936).

The Federal Trade Commission's Report of the Chain Store Investigation, S. Doc.No.4, 74th Cong., 1st Sess. (1935), which featured in the committee hearings on the Patman bill, attacked the grant of preferences in the form of promotional allowances without the rendition of services in return, which the Federal Trade Commission saw as a price discrimination. However, some of the proponents of the Robinson-Patman Act sought to prohibit more than payments for which the buyer did nothing or little. They sought to have Congress prohibit allowances which were actually used for sales promotion unless offered to all buyers on proportionally equal terms; otherwise, the large buyer could still "hitch his own advertising to it as a rider, free of the advertising costs which his competitors cannot escape." Hearings Before Subcommittee of the House Committee on the Judiciary on Bills to Amend the Clayton Act, 74th Cong., 2d Sess. 449 (1936) (statement of Mr. Teegarden, draftsman of the Patman bill), quoted in Rowe, Price Discrimination under the Robinson-Patman Act, 366, 367 (1962).

The question is whether Congress, in applying Section 2(d) to certain promotional allowances for services that were actually rendered, exempted part of what it had originally intended to cover—payments as promotional allowances where the buyers rendered no direct promotional services for the vendor's products. We think the drafting of Section 2(d) not quite so inept, and that payments by vendors solely for the institutional publicity of the buyer come within its ban. Admittedly, it might be difficult to read the language of Section 2(d) to encompass a payment by a vendor to a buyer who did nothing but put the money in his pocket;[6] that would seem to be a Section 2(a) price discrim-

---

5. "The Robinson bill does not say that an allowance may not be made for advertising services. Legitimate allowances for advertising and matters of that nature may be made, but allowances must not be made for the purpose of giving the purchaser an opportunity to buy goods at a lower price than others similarly situated may buy them. It is provided in the Robinson bill that money allowed for advertising purposes must be used to advertise the goods of the seller and not the purchaser's goods, except those which he secured from the seller. How does it work? What has been the result?

"One man, who has a good business, demands a large advertising allowance. He does not use it to advertise the goods of the seller; he does not use it to serv-ice the seller's product; but he uses it to advertise his business in all lines * * * One man gets that advantage while another man does not get it. Thus the one who gets that advantage shifts the advertising of his own business over to the seller, while the other man cannot do so; and consequently it amounts to a discrimination in price." 80 Cong. Rec. 6282 (1936).

6. But see Lever Bros. Co., 50 F.T.C. 494, 511 (1953), where the Commission stated: Section 2(d) permits payments for services or facilities actually furnished. Certainly, payments for services of facilities not furnished are not authorized. The same would be true of payments grossly in excess of the cost or value of the services rendered.

ination. But here Macy's used the payments for institutional advertising and promotions to get more people into its store to buy the goods of all its vendors. The payments by the contributing vendors were thus in consideration for services or facilities furnished by Macy's in connection with the offering for sale of the vendor's goods. To hold otherwise would produce the incongruous result that it would be unlawful for a powerful buyer to secure payments for advertising from his suppliers if he used those payments to confer direct promotional benefits on his suppliers, but that it would be lawful for the buyer to secure such payments if he used them to confer indirect promotional benefits on his suppliers by directly benefiting himself through institutional advertising.

■ But Section 2(d) prohibits only the payment of advertising allowances which are not available to the buyer's competitors on proportionately equal terms. Macy's argues that the Commission must show that the contributing vendors were unwilling or unable to make similar payments to Macy's competitors if and when they had a 100th Anniversary Sale. But once the Commission proved that special payments had been made only to Macy's, the burden of coming forward with evidence that similar payments were available to Macy's competitors when and if they had special institutional celebrations was on Macy's. See Vanity Fair Paper Mills, Inc. v. F. T. C., 311 F.2d 480, 486 (2 Cir. 1962). This burden was not borne by Macy's. Moreover, there is ample evidence introduced by the Commission into the record to demonstrate that contributing vendors were either unwilling or unable to make similar payments to Macy's competitors for institutional celebrations.

■■ We hold that Macy's violated Section 5 of the Federal Trade Commission Act by inducing its vendors to violate Section 2(d) of the Robinson-Patman Act. Since Macy's conduct was an integral part of a transaction banned by Section 2(d), which defines an offense illegal *per se,* the Commission need not prove injury to competition in order to establish a violation of Section 5 of the Federal Trade Commission Act. Grand Union Co. v. F. T. C., supra 300 F.2d at 99.

■■ While the Commission has considerable discretion in framing its orders to enjoin related unlawful acts which may occur, F. T. C. v. Mandel Bros. Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959), the facts of this case do not justify such a broad order. Macy's conduct was by no means a brazen violation of the Act, and it had discontinued its solicitations long before the complaint was filed. Nothing in the record suggests that Macy's intends to resume any related activity. We hold that the order should be limited to the particular kind of practice found unlawful. Grand Union Co. v. F. T. C., supra; American News Co. v. F. T. C., supra; Swanee Paper Corp. v. F. T. C., 291 F.2d 833, 837 (2 Cir. 1961). More specifically, the order should be limited to a prohibition of either knowing receipt or knowing solicitation and receipt of payments by vendors for institutional advertising where such payments are not available to competitors on proportionally equal terms. See Giant Food, Inc. v. F. T. C., 113 U.S.App. D.C. 227, 307 F.2d 184, 187 (1962).

As modified in accordance with this opinion, the decision of the Commission is affirmed. Pursuant to Rule 13(*l*) of this court, the Commission shall submit a proposed enforcement decree conforming to this opinion. The petitioner may object to this proposed decree by filing of a counterproposal within 15 days after the submission of the Commission's proposed decree.