**FRED MEYER, INC., et al., Petitioners,**
v.
**FEDERAL TRADE COMMISSION,**
Respondent.
No. 18903.

United States Court of Appeals
Ninth Circuit.
March 18, 1966.
Rehearing Denied June 8, 1966.

George W. Mead, Portland, Or., Edward F. Howrey, Harold F. Baker, Terrence C. Sheehy, Howrey, Simon, Baker & Murchison, Washington, D. C., for petitioners.

James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, E. K. Elkins, Harold D. Rhynedance, Jr., Attys., Federal Trade Comm., Washington, D. C., for respondent.

Before JERTBERG and DUNIWAY, Circuit Judges, and FOLEY, Jr., District Judge.

DUNIWAY, Circuit Judge.

This is a petition to review and set aside an order of the Federal Trade Commission which directs that petitioners, Fred Meyer, Inc. and two of its officers, all of whom we refer to as Meyer, cease and desist from conduct in alleged violation of section 2(f) of the Clayton Act, 15 U.S.C. § 13(f), and section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

These, as found by the Commission, are the facts. Fred Meyer, Inc., an Oregon corporation, operates a chain of thirteen retail supermarkets in Portland, Oregon, and the immediate vicinity, in which it sells grocery products, drugs, variety items, and a limited line of clothing. Its sales in 1957 exceeded $40 million, making it, during the relevant period, the second largest seller of all goods in the area. In 1960 it made one-fourth of all retail food sales in the Portland area, by its own claim selling to "75% of Oregon's population" through its supermarkets located "in every neighborhood."

In about 1936 petitioner commenced an annual promotion, called the "coupon book promotion," beginning in September and ending four weeks later. The mechanics of the coupon book are simple. Meyer prints a book, usually containing 72 pages, each page of which features a single product. These pages are the "coupons" and each entitles the customer to the specially reduced price there stated. The customer buys the book for the nominal sum of ten cents and must surrender the appropriate coupon when making his purchase of goods. It is a successful promotion: Meyer sold 138,700 books in 1957 and 121,270 in 1958.

The cost of the books and related advertising expenditures [1] was met only in part by revenue from their sale; the rest was supplied, in amounts approximating *total* costs, by participating suppliers who usually paid, at the very least, a flat rate of $350 per coupon page. These payments were made sometimes in cash, sometimes in price discounts on goods purchased for resale during the promotion, and sometimes by replacement of a predetermined portion of the goods so sold. Some of the suppliers further underwrote the promotion by granting volume-based reductions, replacing goods sold, or redeeming coupons in cash at an agreed rate. Certain of these, as well as other unrelated promotional payments which constitute part of the subject matter of the complaint, are detailed in Part I of this opinion.

As a consequence of the solicitation and receipt of these payments, the Commission issued a two-count complaint against petitioners. Count I, based on the coupon book promotion, charged a violation of section 2(f) of the Clayton Act by inducing and receiving "discriminatory prices, discounts, allowances, rebates and terms and conditions of sale" which they knew or should have known were granted in violation of section 2(a) of that Act. Count II charged a violation of section 5 of the Federal Trade Commission Act by the inducement of promotional aid, of the type forbidden by section 2(d) of the Clayton Act, with reference to both the coupon book promotion and other, unrelated promotions. These statutes are set out in pertinent part in the margin.[2]

The Hearing Examiner's decision found the violations as charged. The Commission affirmed and issued the cease and desist order which, exceptions to it having been rejected, is now here for review.

Meyer raises six basic questions here, and levels a broadside attack on the sufficiency of the evidence to sustain the Commission's findings. Those questions are (1) whether the supplier payments here are cognizable at all under section 2(a), (2) whether section 2(d) requires suppliers to refrain from discriminating among customers who occupy different functional levels or varying combinations

---

1. Total promotional expenditures of this type amounted to $23,406, or about 17 cents per book, in 1957, and not dissimilar amounts in the other years involved.

2. Clayton Act § 2, as amended by Robinson-Patman Act, 15 U.S.C. § 13:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the *cost of manufacture,* sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered:"

"(d) It shall be unlawful for any person * * * to pay or contract for the payment of anything of value to or for the benefit of a customer of such person * * * as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the * * * sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

"(f) It shall be unlawful for any person * * * knowingly to induce or receive a discrimination in price which is prohibited by this *section.*"

(References to "commerce" omitted)

Federal Trade Commission Act § 5, 15 U.S.C. § 45:

"(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful. * * *"

of functional levels, (3) whether Meyer knew or had reason to know of the unlawfulness of the payments it induced, (4) whether inducement of disproportionate promotional payments is cognizable under section 5 of the Federal Trade Commission Act, and (5) whether the Commission's cease and desist order was improperly directed to the corporation's officers as individuals, or (6) was improper for failure to reasonably relate to the practices found to be unlawful.

## I. THE EVIDENCE.

Complaint counsel chose transactions with five suppliers—Burlington Industries, Inc., Cannon Mills Company, Tri-Valley Packing Association, Idaho Canning Company, and Phillip Morris, Inc. —during 1956, 1957, and 1958, to ground the complaint. Meyer asserts, with respect to each supplier, that the proof is vitally insufficient to support the findings. We examine the transactions seriatim, stating the facts as the Commission found them.

### A. *Burlington Industries, Inc.*

Burlington participated in the 1957 and 1958 coupon book promotions, agreeing in the spring of each year to reduce its prices to Meyer by, respectively, 50–94 cents and 75 cents per dozen pairs of nylon hose. The disfavored customer, Lipman, Wolfe & Co., a Portland retail department store, received no discount on its contemporaneous purchases.

Meyer argues first that since these purchases were arranged at times separated by substantial intervals, though completed by contemporaneous purchase orders and deliveries, there cannot be that comparability which the statute demands as a basis for a finding of discrimination and injury to competition. The Commission responds that the Act contemplates competition in distribution, which it found to exist, and that the time of purchase by different customers

is only evidence bearing on the existence of that competition. Its contention finds support in Hartley & Parker, Inc. v. Florida Beverage Corp., 5 Cir., 1962, 307 F.2d 916, 921. A substantial time interval indicates only that different prices might have been caused by different market conditions, rather than by an accomplished intent to discriminate. Here the record indicates that market conditions had not changed materially.[3] Such a determination is more properly for the Commission than for the courts. See Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; Carter Prods., Inc. v. FTC, 9 Cir., 1959, 268 F.2d 461, 492, cert. denied, 1959, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed. 2d 120. We cannot say that the determination here is not supported by substantial evidence; it is, therefore, conclusive, 15 U.S.C. §§ 21(c), 45(c); see Universal Camera, supra; cf. 5 U.S.C. § 1009(e) [Administrative Procedure Act § 10(e) (B) (5).] Atalanta Trading Corp. v. FTC, 2 Cir., 1958, 258 F.2d 365, cited by Meyer, is not contrary. There isolated and non-recurring sales of particular products had been made, without allowances, to competitors of the allegedly favored customer several months before and after the sales to the favored customer. The court, contrary to the Commission's construction of the law, held that these facts standing alone could not establish a prima facie case of discrimination because such a rule would force a supplier to elect to give promotional allowances at the time of the first sale of a product or not at all, a result which would "stifle rather than encourage competition and have the practical effect of outlawing all promotional allowances." Id. at 371. But here the sales are of a single, fairly standardized item, widely sold in the area, and recur frequently during the years involved. Hence *Atalanta* is not controlling.

3. The Commission has, in fact, found sales to two competitors three and a half months apart sufficiently comparable on "a showing of continuous sales of regu-

larly promoted items," Joseph A. Kaplan & Sons, Inc., 1963, FTC Dkt. 7813, CCH Trade Reg.Rep. ¶16,666.

■ Meyer next contends that the evidence fails to show that the hosiery purchased by it and by Lipman, Wolfe was of "like grade and quality," (15 U.S.C. § 13(a), Atalanta Trading Corp. v. FTC, 2 Cir., 1958, 258 F.2d 365, 369–370) asserting that the fact that it had entered additional specifications on its purchase orders compels the conclusion that a different grade and quality resulted. However, the record fails to show that these changes, if in fact made, produced any difference in the marketability, appearance, durability, cost or manner of manufacture, or other indicia of "grade and quality" of the goods. Moreover, in Burlington's invoices to both customers the hose are identified by identical style numbers. This, we think, is sufficient to permit the inference that the goods themselves were identical. Cf. Central Paper Co. v. Southwick, 6 Cir., 1932, 56 F.2d 593, 597–598; Straus v. Victor Talking Machine Co., 2 Cir., 1924, 297 F. 791, 804–805; see also United States v. Bryan, 1950, 339 U.S. 323, 332, 70 S.Ct. 724, 94 L.Ed. 884. That each customer specified and received private label packaging does not, without more—and "more" is lacking here—change that conclusion. See Hartley & Parker, Inc. v. Florida Beverage Corp., 5 Cir., 1962, 307 F.2d 916, 923.[4]

Finally, Meyer makes much of the disparity in quantities purchased by it and by Lipman, Wolfe & Co., asserting that by reason of such disparity a presumption of cost justification arises which complaint counsel should but failed to rebut. Such arguments are properly addressed to the proposition that Meyer had no knowledge or reason to know that the allowances it received were discrimina-

tory, and so we relegate consideration of them to that portion of this opinion.

### B. *Cannon Mills Company.*

Cannon Mills is said to have violated sections 2(a)[5] and 2(d) of the Act by granting, at Meyer's instance, a 10 cents per dozen allowance on fingertip towels sold during the 1956 promotion. These towels, regularly sold at retail for 23 cents each, were advertised for sale at 7 for $1.00. Meyer purchased 2,000 dozen in March and another 5,500 dozen in October of 1956, while Roberts Brothers, the Portland retail department store allegedly discriminated against, purchased a total of 600 dozen (bearing the same style number as those purchased by Meyer) in April, June, and November of that year.

■ Meyer again claims that identity of style numbers on billing invoices is insufficient proof of likeness of grade and quality. For the reasons already set out, we disagree. The Commission was justified in concluding that the towels were identical.

■ A somewhat more substantial question is raised by the claim that the record fails to show simultaneity of stocking, handling, or resale of the towels, hence the required competition has not been proved. But again we think that the Commission, more expert than we in the mechanics of retail merchandising, could and did reasonably conclude that such competition existed. A knowledgeable witness, in fact, so testified, and we have previously held substantially identical evidence sufficient to uphold a similar finding, Tri-Valley Packing Ass'n v. FTC, 9 Cir., 1964, 329 F.2d 694, 701.

4. The Commission has long held that brand differences alone do not necessarily compel the conclusion that the products are not of "like grade and quality" and that brand identity may overcome insignificant physical differences in the goods or their containers, see Rowe, Price Discrimination Under the Robinson-Patman Act 69–73 (1962, Supp.1964) and cases cited there.

5. A subsequent proceeding against Cannon Mills, Cannon Mills Co., FTC Dkt. 7494, 3 CCH Trade Reg.Rep. ¶16,878 (1964), resulted in dismissal of the complaint because competitive injury had not been shown. The Commission therefore here refrains from relying on these alleged violations insofar as the section 2(a) charge is concerned.

### C. *Tri-Valley Packing Association.*[6]

█ The Commission's case here is that Meyer purchased, for the 1957 coupon book promotion, 2,200 cases of its private label "My-Te-Fine" fancy grade sliced and halved peaches from Tri-Valley, concededly at the same time that Hudson House, a disfavored wholesaler, purchased 175 cases of identically described merchandise under its own private label from the same source. Tri-Valley agreed to pay Meyer $350 (in merchandise or cash, at its option) for a coupon page and to redeem, in merchandise, every third can sold on the coupon's "Buy two cans and get one free" offer. No such offer was made or made available on proportionally equal terms to Hudson House.

Meyer again founds its attack on the proposition that "like grade and quality" were not sufficiently proved, pointing to evidence in the record tending to show that the quality of peaches sold under the general classification of "fancy" varies according to where, when, and by whom the peaches were grown and packed.

█ But a Portland retailer witness specifically testified that he competed directly, in peaches of the grade and quality purchased from Hudson House, with a nearby Meyer store. And the fact that the goods were identically described on the supplier's invoices to Meyer and to Hudson House sufficiently establishes commercial identity or commercial fungibility, which is all that the Robinson-Patman Act demands.[7] To require the level of proof for which Meyer contends would be to require the impossible.

█ Meyer further argues that the proof is insufficient because it is not shown that these Tri-Valley peaches made their way to customers of Hudson House. We agree. *Tri-Valley Packing Ass'n,* supra, at 708–711, made it clear that competition at the same functional level must be shown. Here, Meyer, an integrated operation, and Hudson House, a wholesaler, do not compete at the same functional level, hence Tri-Valley goods must be directly traced to Hudson's customers to show that Tri-Valley has dealt "directly" with them, that they are "indirect customers" of Tri-Valley and therefore in competition with Meyer in the sale of comparable goods. Ibid.[8] That has not been shown. In consequence, the proof must be held insufficient as to a 2(d)–2(f) charge involving Tri-Valley. Whether it is insufficient support for a 2(a)–2(f) charge or for a Federal Trade Commission Act § 5 charge is considered later in this opinion.

### D. *Idaho Canning Company.*

█ Meyer does not, as it cannot, dispute the sufficiency of proof of simultaneity of sale and comparability of grade and quality of canned corn sold to Meyer and to Hudson House and Wadhams & Co., the nonfavored wholesaler purchasers. Idaho Canning's participation in Meyer's 1957 coupon book promotion consisted of payment in merchandise of $350 for a coupon book page and redemption in free goods of coupons received by Meyer offering one free can of corn for every two purchased, a transaction substantially identical with that of Tri-Valley. Idaho's participation was solicited by Meyer, and it made no com-

---

6. We have previously considered Tri-Valley's participation in Meyer's 1957 coupon book promotion, see Tri-Valley Packing Ass'n v. FTC, 9 Cir., 1964, 329 F.2d 694, 707–710.

7. Cf. Bruce's Juices, Inc., v. American Can Co., S.D.Fla., 1949, 87 F.Supp. 985, 987, aff'd, 5 Cir., 1951, 187 F.2d 919, 924. See also Moog Indus., Inc. v. FTC, 8 Cir., 1956, 238 F.2d 43, 49–50, aff'd, 1958, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed. 2d 370.

"The 'like grade and quality' concept * * * was designed to serve as one of the necessary rough guides for separating out those commercial transactions insufficiently comparable for price regulation by the statute." Report of the Attorney General's National Committee to Study the Antitrust Laws 157–58 (1955).

8. See Rowe, Price Discrimination Under the Robinson-Patman Act, § 13.11 at pp. 398–99 (1962, Supp.1964) and cases there cited.

parable offer to Hudson House or Wadhams & Co.

Equally here, the proof is vitally insufficient to support a 2(d)–2(f) charge in that the goods were traced only to the wholesaler. Robinson-Patman doctrine has not yet progressed to a point which allows the Commission to infer an "indirect customer" relationship from the mere fact that goods were supplied to a middleman, at least where those goods became inextricably mixed with other, identical goods purchased from other suppliers before their resale to retailers. No more than that has been proved here.

### E. Phillip Morris, Inc.

The complaint charges violations involving Phillip Morris of § 2(d) and of § 5 of the Federal Trade Commission Act, but not of § 2(a). These alleged violations were the solicitation and receipt by Meyer of (1) a $500 payment for participation in Meyer's 1956 "Gift Days" promotion; (2) a $400 payment on April 26, 1957 in connection with Meyer's 1957 "Thrift Days" promotion; (3) a payment of $800 (received on October 24, 1956) for Meyer's promotion of Parliament cigarettes during September, 1956; and (4) payment of $150 per month during most of 1956 for promotion of Phillip Morris tobacco products. Meyer does not contend that the payments were not made. It does say, however, that mere proof of payments is insufficient proof of a § 2(d) violation in the absence of a showing that proportionally equal payments were not made to competitors.

The evidence before the Commission on this point is indeed scanty. Meyer's tobacco buyer testified that she had initiated the negotiations leading, upon submission of bills to Phillip Morris, to receipt of these payments. A Phillip Morris representative characterized these payments, by implication, as "special deals." He testified that these "special deals" were not offered to his company's customers as a matter of course nor publicized in any way, and that he could not recall offering similar proposals to customers other than Meyer. The general manager of Oregon Piggly Wiggly Company, an allegedly disfavored Portland retailer, testified that that organization had received no promotional allowances from Phillip Morris in or for promotional activities during September, 1956 and that the only payment received[9] during the months of March through May of 1957 was a $357.75 contribution toward the cost of soft drinks given away on the sale of cigarettes. Testimony of personnel of United Grocers, the other Portland purchaser allegedly discriminated against, was to the general effect that that organization had received no promotional allowances during 1956 and 1957 other than the tobacco industry's normal promotional payments adverted to in note 9, supra.

■■■ On the basis of this evidence, the Commission concluded that the payments received by Meyer were *in addition to* "regular" promotional payments, that they were not made proportionally available to other, competing retailers of the same goods, and moreover, that they were "virtually incapable of being offered on proportionally equal terms." We cannot say that that conclusion was erroneous as a matter of fact.[10]

This instance merely points out two factors common to Commission proceedings and to our review of them. First,

---

9. We do not concern ourselves here with the regularly-advertised, volume-based promotional allowances which both parties concede were made proportionally available.

10. "A course of conduct under which a seller fails to inform respecting such compensation or make known his terms or otherwise to offer them to one customer while granting payment for services to his rival reseller essentially represents concealment. In such case, the credit or allowance is not 'available' to the unfavored competitor, for all practical purposes a withholding and denial of opportunity to share occur, and the law is violated." Kay Windsor Frocks, Inc., 1954, 51 F.T.C. 89, 95. Cf. Vanity Fair Paper Mills, Inc. v. FTC, 2 Cir., 1962, 311 F.2d 480, 484–486.

those witnesses in possession of the most enlightening evidence are usually representatives of respondents or potential respondents, who have an interest in revealing only what they must and in volunteering nothing. Second, application of the Commission's reserve of expertise to this sometimes painfully extracted testimony may produce conclusions, and valid conclusions, quite different from those which an uninitiated fact-finder might reach. And, of course, the Commission and its Hearing Examiner are closer to the facts than we are, and we cannot discount the justifiable effect which weak and evasive responses, apparent even on the face of this cold record, may have had on them. It is worth noting, for example, that while the Commission set aside many of the conclusions of the Examiner here, it agreed with him that the Phillip Morris payments were not offered to other purchasers on a proportionally equal basis; both opinions relied heavily, perhaps primarily, on the testimony of Phillip Morris' representative, who nowhere testified affirmatively to such a state of facts. In sum, the evidence is weak but not insufficient.

Meyer, however, attacks on other grounds, claiming that the Commission erred in classifying United Grocers as a retailer rather than a wholesaler. If this is true, then it and Meyer compete at different functional levels and, according to petitioner, therefore there is no obligation on Phillip Morris (under *Tri-Valley Packing Ass'n,* supra) to offer it proportionally equal promotional benefits.

There is a broad gamut of possible organization of functions, and in that range a buying cooperative such as United Grocers may function as an agent of each retailer-member, as a wholesaler, or as something between those extremes. We think that, within limits, classification here is in the province of the finder of fact. While we have some difficulty ac-

cepting the Commission's conclusion that United Grocers is "plainly" a retailer,[11] we find it unnecessary to decide the question ourselves since we uphold the Commission's finding of discrimination against Oregon Piggly Wiggly Company, concededly in functional competition with petitioner.

The question of law which accompanies the foregoing factual determination, whether a 2(d) violation may exist where the favored and nonfavored customer inhabit different functional levels, was settled in Meyer's favor in Tri-Valley Packing Ass'n v. FTC, supra.

II. ARE THE PAYMENTS RECEIVED FROM SUPPLIERS IN CONNECTION WITH THE COUPON BOOK PROMOTIONS COGNIZABLE UNDER SECTIONS 2(a) AND 2(f) OF THE CLAYTON ACT?

Meyer tenders, as the first of two "threshold questions," the proposition that no part of the payments here made by Burlington Industries, Tri-Valley, and Idaho Canning can be held violative of section 2(a) of the Clayton Act. This conclusion, it says, is compelled by the facts that "(1) the coupon book promotion was an institutional promotion involving a combination of advertising and promotional services furnished by or through Fred Meyer 'in connection with the processing, handling, sale or offering for sale' of the individual supplier's products, and (2) the payment of each supplier was made pursuant to agreement with Fred Meyer which contemplated, and was tied directly to, the furnishing of promotional services and facilities by Fred Meyer in connection with the resale of the products of the participating suppliers." It reasons that the "ultimate legal question here involved" is whether the payments made are to be classified as price reductions (cognizable under 2(a) and therefore under 2(f)) or promotion-

---

11. The organization and operation of United Grocers, as reflected in this record, seems quite similar to that of Central Grocers, Inc., a quasi-cooperative owned by its retailer-members, which we treated as a wholesaler in Tri-Valley Packing Ass'n v. FTC, supra, 329 F.2d at 706–710.

al payments, that the latter classification is the proper one, and therefore that the purported violations are cognizable if at all only under section 5 of the Federal Trade Commission Act. Several subsidiary arguments are advanced as well, and will be examined below.

Commission counsel respond that sections 2(a) and 2(d) are not mutually exclusive, that in fact they overlap in such a manner as to bring the payments here under the prohibition of both sections. There is some support in the commentators and case law for this position, see Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act 126 (2d ed. 1959); cf. Elizabeth Arden Sales Corp. v. Gus Blass Co., 8 Cir., 1945, 150 F.2d 988, 990, 993, 161 A.L.R. 370, cert. denied, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467; Sun Cosmetics Shoppe v. Elizabeth Arden Sales Corp., S.D.N.Y., 1949, 82 F.Supp. 687, 688, rev'd on other grounds, 2 Cir., 1949, 178 F.2d 150, 13 A.L.R.2d 358; Conference Report, H.R. Rep. No. 2951, 74th Cong., 2d Sess. at 5.

■■■ However, it is not necessary that that question be decided here. We agree with the Commission that a multipartite transaction may in its separate parts violate separate prohibitions of the Robinson-Patman Act. So here. The Commission found that the first $350 payment by each supplier constituted a true promotional payment for which it received value in Meyer's promotional services rendered, and that the balance of each payment, tied as it was to the volume of goods sold and ranging in amount up to one-third of the regular price to Meyer of those goods, constituted a distinct price discrimination, cognizable under section 2(a). We cannot agree with Meyer that the Commission made this classification "arbitrarily." While it claims that the Commission erred in finding that all participating suppliers paid a flat rate of $350 per coupon book page, it does concede that a very substantial percentage of suppliers paid this or some similar flat rate. And while it is correct in asserting that services rendered need not be shown precisely to equal promo-

tional payments received, see Giant Foods, Inc., 1961, 58 F.T.C. 977, 1010; Lever Bros., 1953, 50 F.T.C. 494, 511, the relationship between payments received and promotional services rendered cannot be unreasonable, see Giant Foods, Inc., supra. Here the payments received from Tri-Valley in 1957 exceeded $350 by $4,-814 (20,750 coupons redeemed in merchandise at $.232 per coupon), from Idaho Canning in 1957 by $2,585 (21,367 coupons redeemed at $.121), from Cannon Mills in 1956 by about $400, and from Burlington Industries in 1957 and 1958 by a total of about $2,800. In view of such substantial disparities between receipts and proved allocable expenses, we think the Commission correctly decided that these excesses were "outright price concessions" and, since the amounts were directly related to and dependent upon the amount of goods purchased and resold by Meyer, price concessions cognizable under section 2(a) rather than under section 5 of the Federal Trade Commission Act. Cf. National Tea Co., 1950, 46 F.T.C. 829, order modified, 1951, 47 F.T.C. 1314.

■■■ But, says Meyer, the Commission itself has determined, in proceedings against these suppliers, that some of the payments we consider here were promotional, not price concessions. This contention has no substance. We cannot concern ourselves with questions of Commission strategy or Commission decisions as to whom to prosecute and for what acts. Even a successfully completed proceeding against a supplier for a 2(d) violation would not necessarily foreclose a contemporaneous or subsequent action against an inducing buyer for a 2(a)–2(f) violation where the payments involved violate both sections.

III. DOES SECTION 2(d) OF THE CLAYTON ACT REQUIRE A SELLER TO OFFER PROPORTIONALLY EQUAL BENEFITS TO ITS CUSTOMERS AT DIFFERENT FUNCTIONAL LEVELS?

This is the second "threshold question" asserted by Meyer. The Commission con-

cedes that, to sustain the position taken by it in its opinion, we would have to "reconsider" our decision in *Tri-Valley Packing Ass'n,* supra, where we held, on facts essentially identical with those produced here, that "[n]o section 2(d) violation was shown as to the wholesale operation of Hudson House, because that operation was not in functional competition with Meyer \* \* \* ", id., 329 F.2d at 710. However, it urges us to overrule *Tri-Valley* because, it says, the issue was not fully briefed or argued there, the result was plainly contrary to the language of the Clayton Act and was other than that intended by Congress when it passed the Robinson-Patman Act, and the effect of the case was to immunize a practice intended to be stamped out by that legislation, specifically, the bringing to bear of the economic power of the chains upon suppliers to wring from them prices lower than smaller and less powerful unorganized retailers can extract.

But the issue was considered and considered at length, as a reading of that opinion demonstrates, the "intent" of Congress is not as clear as respondent asserts, and no concrete showing of any increase in abuse by large buyers of their inherent power has been made here. Consequently, we are not inclined after so short a time to re-examine that decision, and adhere to the result reached there.

## IV. DID MEYER KNOW OR HAVE REASON TO KNOW THAT THE CONCESSIONS IT INDUCED WERE DISCRIMINATORY AND UNLAWFUL?

█ The Commission found that Meyer knew or had reason to know that the payments it received were unlawful.

That is one of the elements of proof required by section 2(f) and given content by Automatic Canteen Co. of America v. FTC, 1953, 346 U.S. 61, 79–81, 73 S.Ct. 1017, 97 L.Ed. 1454. The Court also held that the ordinary elements of a section 2(a) case must be shown. As explained below, we think the 2(a) elements have been adequately proved, and that the only serious question is as to Meyer's knowledge. That, too, we resolve in the Commission's favor.

A. *The necessity of "pressure" or coercion.*

Meyer seems to take the position that the Commission must establish that the buyer exerted "pressure", see *Automatic Canteen,* supra, at 79, 73 S.Ct. 1017, amounting to outright extortion, conceding that in that case the coercion would render the buyer's claimed lack of knowledge culpable, see American News Co. v. FTC, 2 Cir., 1962, 300 F.2d 104, 107. We think that *Automatic Canteen* does not go so far.

█ First, we do not understand the Court to have gone beyond the simple statutory requirement of "inducing" (and clearly petitioner "induced" the payments it received here); we take its words as being more of description than of measurement. Second, "pressure" may be brought to bear in a variety of ways, overt and covert, and petitioner here obviously applied some pressure. This, the fact of Meyer's self-professed market power, and the Commission's superior fact-finding position are sufficient to persuade us not to declare groundless its finding that, whatever may be the degree of "pressure" necessary to sustain a 2(f) violation, that pressure existed and was successfully applied.[12]

---

12. We need not finally decide here whether actual coercion is necessary to establish the prima facie case, nor do we intimate any view on the result should such overt coercion not be shown.

We do note, however, that the Congress was aware at the time of passage of the Robinson-Patman Act that "it is the manufacturer's recognition that the chain, with its tremendous purchasing and distributing power, may do those things ["buy the goods elsewhere, proceed to manufacture its own, or conduct its stores so as to discourage therein the sale of the recalcitrant manufacturer's goods"] and not the 'threat' of the chain to do them that is the real inducement for granting the special concession.' Final

**B. *The effect of quantity differences.***

Next, Meyer points to *Automatic Canteen's* requirement that where the quantities sold to the favored and non-favored buyers are not the "same"—which we interpret as meaning substantially the same—the Commission must only show that such differences could not give rise to "sufficient [cost] savings * * * to justify the price differential" and that the buyer should have so known. Meyer insists that the quantity differentials are too great here to permit the Commission's inference that Meyer had reason to know that the differentials could not be cost-justified, and therefore that Count I of the complaint must fall.

 Those quantity differences were indeed large; large enough, we assume, to cast on the Commission the burden of showing that petitioner knew or should have known that they still could not be cost-justified. Was that burden carried here? We think it was. The Commission relied on several factors in reaching its conclusion that Meyer had reason to believe[13] that its suppliers could have no cost justification defense. First, none of the suppliers involved grant quantity discounts. Second, Meyer itself pays the going price during the other eleven months of the year. From this the Commission infers, and fairly, that no measurable cost savings are produced by petitioner's somewhat larger sales and related purchases during the one-month promotion.[14] It buttresses that conclusion by a similar inference drawn from the fact that, during those eleven months, Meyer's sizeable purchases and its competitors' substantially smaller purchases are made at the same price. Third, the price concessions Meyer obtained from Idaho Canning and Tri-Valley amounted to a full third of the regular price. This, with and particularly against the background of the other two factors, led the Commission to the conclusion that petitioner "should have known" something was amiss. We cannot say that inference is unwarranted. That the Commission did not prove the costs of the suppliers is immaterial. Costs surveys are expensive and labyrinthine proceedings whose results are often dependent upon the cost accounting theory used. To require them in all proceedings, even againt buyers, would too often be an exercise in futility. At least where the facts and the inferences to be drawn are as clear as they are on this point, we think the method of proof adopted by the Commission here is appropriate to its end, that of showing that the buyer "is not an *unsuspecting recipient* of prohibited discriminations," *Automatic Canteen,* supra, 346 U.S. at 81, 73 S.Ct. at 1028. (Emphasis added.)

Obedient to the command of *Automatic Canteen,* the Commission also inquired into possible cost differences to the seller in "sale or delivery," id. at 80, 73 S.Ct. 1017. However, in finding that there were no such savings, it relied only on (1) testimony of Meyer's employees to the effect that the increased purchases for the promotion resulted in no changes in Meyer's costs or procedures which might provide cost savings for the suppliers and (2) testimony of a supplier's employee which we think unsatisfactory. Meyer attacks the sufficiency of this evi-

---

Report on the Chain-Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess., p. 49 (1934).

As to violations of § 5 of the Federal Trade Commission Act, no showing of "coercion" is necessary. R. H. Macy & Co. v. FTC, 2 Cir., 1964, 326 F.2d 445, 447.

13. The inquiry here was devoted to ascertaining this fact, not to whether cost justification did or did not exist in fact. No cost studies were introduced by either party.

14. Meyer suggests but failed to prove that its sales during the balance of the year were significantly lower. Such a failure to introduce evidence within its possession probably strengthens and certainly cannot weaken the Commission's conclusion. See Mammoth Oil Co. v. United States, 1927, 275 U.S. 13, 52, 48 S.Ct. 1, 72 L.Ed. 137; cf. Vanity Fair Paper Mills, Inc. v. FTC, 2 Cir., 1962, 311 F.2d 480, 485–486; 2 Wigmore, Evidence, p. 164 (3d ed. 1940).

dence, pointing to other evidence in the record which does tend to show that its suppliers' methods of sale and intensity of sales effort differed as between Meyer's regular purchases and special promotion purchases. But we believe that the Commission could find, from the *elements* of the testimony referred to above, that Meyer continued for the most part to purchase in usual method, on its usual terms, and that such differences as might have existed were inconsequential.

In summary, we consider that the evidence which supports the Commission's finding that Meyer had reason to believe that the discriminatory terms and prices it received were not cost-justified is weak but not insufficient. This conclusion is buttressed by the fact that *Automatic Canteen* itself pointed out that "[t]he showing of knowledge * * * will depend to some extent on the size of the discrepancy between cost differential and price differential * * *. A showing that the cost differences are very small compared with the price differential * * * should be sufficient." Id. at 80, 73 S.Ct. at 1028. Here the Commission had before it evidence from which it could infer that manufacturing, selling and delivery cost savings were negligible. The price differential amounted to as much as one-third of the regular price. That, in the circumstances of this case, is enough to satisfy *Automatic Canteen's* requirement of a cost/price comparison.

## C. *Competitive injury.*

Meyer also questions the reasonableness of the Commission's finding of competitive injury. It cites American Oil Co. v. FTC, 7 Cir., 1963, 325 F.2d 101, 106, cert. denied, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 to support its conclusion and claims that the Commission's dismissal of a related proceeding, In re Cannon Mills Co., 1964, 3 CCH Trade Reg. Rep. ¶16,878, on this ground constitutes an "acknowledge[ment] that the nature of the concessions received by Fred Meyer for the coupon promotions were not such as to create a reasonable probability of substantial injury to com-

petition within the meaning of section 2(a)."

But *American Oil* is not such substantial support as Meyer thinks. There a section 2(a) charge grew out of a retail gasoline price war, during the course of which American supplied its dealers in the battle zone at lesser prices than those it charged elsewhere. The conflict raged for only 17 days and every station in the area participated. On these facts the court held that only slight and non-recurring injury below the statutory level of notice took place and that it would have taken place whether or not American had lowered its own prices. The case is obviously different where the discrimination recurs regularly and has a substantial impact upon competition. This is the situation here. We think this case is closer to those systematic and permanent discriminatory pricing systems held invalid in such cases as FTC v. Morton Salt Co., 1948, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (discriminatory volume discounts) and Corn Prods. Ref. Co. v. FTC, 1945, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (systematic discrimination based on "phantom" freight charges and other factors) than to the one disclosed by *American Oil,* and so affirm the Commission's conclusion.

## D. *The duty of inquiry.*

The Commission held that "a buyer who initiates a promotional service and induces his suppliers to pay him for performing it has possessed himself of 'information sufficient to put upon it the duty of making inquiry to ascertain whether the suppliers were making such payments available on proportionally equal terms to [his] competitors,'" relying on, inter alia, Giant Food, Inc. v. FTC, 1962, 113 U.S.App.D.C. 227, 307 F.2d 184, 187, cert. denied, 1963, 372 U.S. 910, 83 S.Ct. 723, 9 L.Ed.2d 718. The consequence of such a rule is that where sufficient facts exist, the buyer has that knowledge which section 2(f)— and F.T.C. Act § 5, under the general assimilation of Robinson-Patman standards of liability and proof—requires.

Meyer attacks that holding on a variety of grounds.

■ First, it says, that rule is applicable only where the buyer's receipt of payments is "culpable," and cites a number of cases [15] for the proposition that "there is a presumption that men obey the law." But knowledge of probable illegality is equivalent to "culpability", American Motor Specialties, Inc. v. FTC, 2 Cir., 1960, 278 F.2d 225, cert. denied, 364 U.S. 884, 81 S.Ct. 169, 5 L.Ed.2d 105; cf. Giant Food, Inc., supra, and Meyer had knowledge of at least sufficient facts to create a reasonable suspicion that the payments it received were probably illegal. Hence the "presumption" whose benefit Meyer claims cannot apply. Rather, the duty to inquire arises. Giant Food, Inc. v. FTC, supra; see Grand Union Co. v. FTC, 2 Cir., 1962, 300 F.2d 92, 100; American News Co. v. FTC, 2 Cir., 1962, 300 F.2d 104, 110, cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64.

■ Second, Meyer claims error in the stated grounds for the Commission's finding that Meyer must have known the payments it received to be incapable of proportionalization. The Commission here appears to have relied on statements in petitioner's solicitation material requiring that "Offer Must be Exclusive at Fred Meyer During the 4 Week Period" and asserting that its coupon book scheme represented a "unique" promotional device, in reaching its conclusion that the coupon book payments *could not be proportionalized.* It found support for this and for its holding that Meyer must have known that the payments solicited from Phillip Morris were disproportional in *Giant Food, Inc.*, supra, 307 F.2d at 187. There an agreement in the buyer's promotional contracts with its sellers that "This contract does not alter or replace currently existing agreements between Giant Food Department Stores and participating manufacturers," was interpreted to mean that "Giant's program was designed to exist independently of and/or coextensively with any of its suppliers' regularly available cooperative advertising programs." [16] While we do not agree that a supplier could never proportionalize benefits to its other customers while participating in a program of the degree of "uniqueness" shown here, we do hold that in the circumstances, the Commission could find that benefits here could not be proportionalized, or at least that Meyer had reason to know of the high degree of unlikelihood that they could be. As the Commission's opinion points out, Meyer itself, for almost 30 years, has considered a four-week span in September and October to be the most propitious time for a promotion of this nature. Consequently a supplier's agreement with another customer to enter into an identical agreement at another time presumably would not result in equal benefit to either. And by petitioner's own claim, the coupon book plan assures the supplier of "mass distribution of your product at the lowest possible cost." In the absence of contrary evidence, cf. R. H. Macy & Co. v. FTC, 2 Cir., 1964, 326 F.2d 445, 450, the Commission was clearly entitled to take Meyer at its word and to draw the obvious inferences.

Third, Meyer argues that the record shows only that it operated an extensive

---

15. United States v. Detroit Lumber & Timber Co., 1906, 200 U.S. 321, 26 S.Ct. 282, 50 L.Ed. 499; Athens Roller Mills, Inc. v. Commissioner of Internal Revenue, 6 Cir., 1943, 136 F.2d 125, 128; Fidelity & Deposit Co. of Maryland v. Grand Nat'l Bank, 8 Cir., 1934, 69 F.2d 177, 183; St. Joseph Stockyard Co. v. United States, 8 Cir., 1911, 187 F. 104, 106.

16. Meyer claims that the Commission was not entitled to rely on the material which we have quoted from its solicitations for participation for the reason that "the record * * * contains no explanation of the meaning, purpose, or operation of the language." But *for that very reason* we think the Commission was entitled to rely on the plain meaning of the words. Meyer was in a better position than anyone else to show that the words do not mean what they seem to say. Therefore it should bear the burden of disproof, under a balancing of convenience and fairness, see *Automatic Canteen*, supra.

information-gathering system, not that it learned by that system who its competitors in the sale of the goods involved here were nor what prices they actually paid. Therefore, it says, it could not know that it was receiving discriminatory prices, and the whole complaint must fall.

The Commission characterized Meyer's investigative activities as a "vigorous intelligence network," finding that Meyer regularly monitored all grocery retailer advertisements on both a local and national scale, engaged in "comparison shopping" of competitive stores, purchased and tested competing goods, and regularly reviewed price bulletins distributed by suppliers and brokers serving the area.

It must be remembered that the inquiry here is as to what petitioner knew *or had reason to know*. Meyer obviously had a great deal of the trade knowledge referred to in *Automatic Canteen, supra*. It is a fair inference that it was aware that, as several witnesses testified, both wholesalers and retailers in the grocery industry operate on a profit margin approximating 2%, that mark-ups on the goods in question are often lower than the price concessions it received, and that customers can be "switched" from one retailer to another simply by reason of a few cents' difference in price on particular items. Meyer itself carefully required of its special promotion suppliers that "Offer Must Be Exclusive at Fred Meyer During the 4 Week Period."

 Against this background the mere fact that the record fails to show exact knowledge by Meyer of the precise identity of each competitor in each particularized kind and grade of goods and of the prices paid by competitors for them cannot avail the petitioner: It had "reason to know." See Giant Food, Inc. v. FTC, supra; Grand Union Co. v. FTC, supra; American News Co. v. FTC, supra; cf. Automatic Canteen Co. v. FTC, supra, 346 U.S. at 79–80, 73 S.Ct. 1017; Tri-Valley Packing Ass'n v. FTC, supra, 329 F.2d at 708–09.

## V. DOES FEDERAL TRADE COMMISSION ACT § 5 REACH INDUCEMENT OF DISCRIMINATORY PROMOTIONAL ALLOWANCES?

 We must resolve, for the first time in this circuit, the question whether the Commission may proceed against a buyer under § 5 of the Federal Trade Commission Act for inducing and receiving a discriminatory promotional allowance, a practice not expressly declared unlawful, as to buyers, by the Robinson-Patman Act, nor to sellers where, as here, the discrimination is among purchasers at different functional levels of competition. Tri-Valley Packing Ass'n v. FTC, 9 Cir., 1964, 329 F.2d 694, 708. The Commission takes the position that it has such power. Meyer disagrees.

This is not an entirely novel question; two other Courts of Appeals have considered similar problems and side with the Commission, see R. H. Macy & Co. v. FTC, 2 Cir., 1964, 326 F.2d 445; Giant Food, Inc. v. FTC, 1963, 113 U.S.App. D.C. 227, 307 F.2d 184, cert. denied, 1963, 372 U.S. 910, 83 S.Ct. 723; American News Co. v. FTC, 2 Cir., 1962, 300 F.2d 104, cert. denied 371 U.S. 824, 83 S.Ct. 44; Grand Union Co. v. FTC, 2 Cir., 1962, 300 F.2d 92; see also FTC v. J. Weingarten, Inc., 5 Cir., 1964, 336 F.2d 687, 693, cert. denied, 1965, 380 U.S. 908, 85 S.Ct. 890, 13 L.Ed.2d 796. No case has rejected the result these circuits have reached. We find the reasoning of those cases persuasive, and adopt it. We therefore sustain the Commission here.

## VI. THE COMMISSION'S ORDER.

Finally, Meyer challenges both the scope of the resulting order and the fact that it is addressed to the two senior officers of the corporation as well as to the corporation itself.

### A. *The Officers.*

 According to Meyer, the facts are that Fred G. Meyer, the chairman of the board of directors of Fred Meyer, Inc., owns only a minority of the outstanding shares (38.35%), "has nothing to do with the advertising and sales poli-

cies of the corporate petitioner," and "is not even familiar with the operation of the coupon book program." Earle A. Chiles, petitioner's president, concededly is "generally responsible for merchandising operations, but only at a policy-making level," and owns 14.37 percent of the stock. These facts, it claims, are insufficient to support an order running directly to these men as individuals and officers of the corporation.

When these attributes are taken singly, petitioner's position may in some circumstances be correct, see Ostermoor & Co. v. FTC, 2 Cir., 1927, 16 F.2d 962, 51 A.L.R. 327; In re Maryland Baking Co., 1956, 52 F.T.C. 1679, 1691. But the Commission found that this, a "family" corporation (the individuals and their families own almost all of the corporate stock), was "nothing but the 'alter ego' of those two individual respondents." Moreover, Chiles himself testified that "we set the policies and review the practices." And Meyer was originally responsible for instituting the coupon book promotion. We think that, despite Meyer's denials of knowledge of the operations of the business, the Commission was justified in concluding that "if 'a majority of Portland's 120,000 families' were apprised of the details of these programs, we think it is a fair inference that the Chairman of the Board also knew about them," [r. 138.] and in joining both as respondents. See Mandel Bros., Inc. v. FTC, 7 Cir., 1958, 254 F.2d 18, 22, rev'd on other grounds, 1959, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893; cf. Western Fruit Growers Sales Co. v. FTC, 9 Cir., 1963, 322 F.2d 67, 69–70, cert. denied, 376 U.S. 907, 84 S.Ct. 661, 11 L.Ed.2d 606.

B. *The Scope of the Order.*

The Commission's Final Order commands that the corporate petitioner and its two named officers cease and desist from

"Knowingly inducing, or knowingly receiving or accepting, any discrimination in the price of such products by directly or indirectly inducing, receiving, or accepting from any seller a net price respondents know or should know is below the net price at which said products of like grade and quality are being sold by such seller to other customers where respondents are competing with the purchaser paying the higher price or with a customer of the purchaser paying the higher price."

This we refer to as the 2(a)–2(f) order. They are further ordered to cease and desist from

"Inducing and receiving anything of any value from any supplier as compensation or in consideration for services or facilities furnished by or through respondents in connection with the processing, handling, sale or offering for sale of products purchased from such supplier, when respondents know or should know that such compensation or consideration is not being affirmatively offered or otherwise made available by such supplier on proportionally equal terms to all of its other customers competing with respondents in the sale and distribution of such supplier's products, including other customers who resell to purchasers who compete with respondents in the resale of such supplier's products."

This we refer to as the § 5 order. Meyer attacks both orders on the grounds that they bear no reasonable relationship to the practices found to be unlawful and that they fail to mention or limit themselves to the coupon book promotion. Moreover, it says, the 2(a)–2(f) order is too broad in that it is not confined to the narrow product categories in suit, and because (as we make out the argument) Meyer might not know that products of like grade and quality being sold in competing outlets were sold to those outlets by its own seller. The section 5 order is claimed to be improper because it is not limited to the specific unlawful practices found here and because it applies to "other customers who resell to purchasers who compete with respondents," i. e., those wholesalers whom we held to be not

under the protection of section 2(d) in *Tri-Valley Packing Ass'n,* supra.[17]

Under what is sometimes called the Clayton Finality Act, adopted in 1959, 15 U.S.C. § 21, the Commission's order, when it becomes final, subjects respondents to a $5,000 penalty for each violation, and, where the violation is continuing, to $5,000 per day penalty while it continues. This, we think, requires that Commission orders be more carefully framed than formerly, and that they no longer be a mere command to obey the statute. This, we think, is the effect of Mr. Justice Brennan's caveat in FTC v. Henry Broch & Co., 1962, 368 U.S. 360, at 367–368, 82 S.Ct. 431, 436, 7 L.Ed.2d 353. There he said:

"We do not wish to be understood, however, as holding that the generalized language of paragraph (2) would necessarily withstand scrutiny under the 1959 amendments. The severity of possible penalties prescribed by the amendments for violations of orders which have become final underlines the necessity for fashioning orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application."

In Swanee Paper Corp. v. FTC, 2 Cir., 1961, 291 F.2d 833, 837–38, cert. denied, 1962, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed. 2d 525, a § 2(d) case, the court said:

"Administrative agencies have wide discretion in framing their orders and are empowered to enjoin other related unlawful acts which may occur in the future * * * but there must be some relation between the facts found and the breadth of the order. * * * Moreover, the order is not even limited to related activities but enjoins Swanee from violating Section 2(d) in the very words of the statute. * * * Moreover, the order as written is so broad that, under the new enforcement pro-

visions of the Clayton Act (15 U.S.C.A. § 21), the duty of enforcing the prohibitions of Section 2(d) as to Swanee is shifted from the Commission to the federal courts, which may in the future be forced to decide the very issues that Congress has entrusted the Commission to determine. * * * [W]e therefore hold that the order should be limited to the particular practice found to violate the statute."

The court directed, under its rule 13(1), that the Commission prepare an order in conformity with the court's opinion. A similar result was reached in Grand Union Co. v. FTC, 2 Cir., 1962, 300 F.2d 92, 101–2, a § 5 case involving, as this one does, violation of § 2(d), and for similar reasons. To the same effect is American News Co. v. FTC, 2 Cir., 1962, 300 F.2d 104, 111, also a § 5–§ 2(d) case. See also Joseph A. Kaplan & Sons, Inc. v. FTC, 1965, 121 U.S.App.D.C. 1, 347 F.2d 785, 788–791.

We think that the order here is subject to many of the stictures levelled by the courts at the orders involved in the foregoing cases. We reject, however, the contention that the order should be restricted to the specific products involved in the violations proved, or to any specific product. The scheme involved is much broader, and an order can properly be directed against such a scheme or comparable ones. We think that the order goes much beyond that and should be so limited. The 2(a)–2(f) order also seems, on its face, to exclude the normal defenses to a section 2(a) violation charge. This, we think, is improper. The section 5 order covers "processing, handling," not here involved. The language in that order: "including other customers who resell to purchasers who compete with respondent in the resale of such suppliers' products" must be stricken. The order is also overly broad as to the two individuals; it should be limited to ac-

---

17. Meyer attacks various isolated phrases of this order as well, but an examination of the language to which it objects reveals that such language, though included in the Hearing Examiner's proposed order, was not included in the Commission's final order quoted above.

tivities related to the business of Fred Meyer, Inc.

The Commission knows how to draw narrower orders. (See The Quaker Oats Co., CCH Trade Reg.Rep., 1961–63 Transfer Binder, ¶15,858; Vanity Fair Paper Mills, Inc., CCH Trade Reg. Rep., 1961–63 Transfer Binder, ¶15,796; Transogram Co., CCH Trade Reg.Rep., 1961–63 Transfer Binder, ¶16,080; All-Luminum Prods., Inc., 3 CCH Trade Reg.Rep. ¶16,665.) It is the expert body. We leave to it the preparation of an order consistent with this opinion.

The order, when properly modified, will be enforced. The Commission shall prepare a proposed decree, conforming to this opinion, pursuant to our Rule 34, subparagraph (12).